541 So.2d 1243 (1989)
STATE of Florida, DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, Appellant,
v.
MID-FLORIDA GROWERS, INC., and Himrod & Himrod Citrus Nursery, a Partnership Composed of Joe Himrod and Joe B. Himrod, Appellees.
No. 88-1369.
District Court of Appeal of Florida, Second District.
March 8, 1989.
Harry L. Michaels, Asst. General Counsel, Dept. of Agriculture and Consumer Services, Robert A. Butterworth, Atty. Gen., Louis F. Hubener and Beverly McLear, Asst. Attys. Gen. Dept. of Legal Affairs, Tallahassee, for appellant.
M. Stephen Turner and David K. Miller of Broad and Cassell, Tallahassee, for appellees.
ALTENBERND, Judge.
The Department appeals a final judgment which awards damages to two citrus nursery owners in an inverse condemnation proceeding. The final judgment compensates the nursery owners both for the Department's destruction of their existing nursery stock in October 1984 and for subsequent lost or retarded production of new *1244 stock. We affirm the jury's award to compensate the nursery owners for the destruction of their existing nursery stock. We reverse the jury's award of damages for subsequent lost production. In reversing this award, however, we authorize the nursery owners to file additional pleadings upon remand in the lower court in an effort to recover damages for a temporary taking under the guidelines described in First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Because the issues presented by this case are matters of great public importance, we also certify two questions to the Florida Supreme Court.
From October 7 to October 19, 1984, the Department burned the entire nursery stock at nurseries operated by Mid-Florida Growers, Inc., and Himrod & Himrod Citrus Nursery. On August 5, 1985, Mid-Florida and Himrod filed this lawsuit against the Department alleging inverse condemnation. A bench trial on the issue of liability took place on September 24, 1986. The trial judge ruled that the burning of the nurseries' citrus stock constituted a taking and that the nursery owners were entitled to full compensation under article X, section 6, Florida Constitution. That decision was affirmed by both this court and the Florida Supreme Court. State, Dep't of Agriculture v. Mid-Florida Growers, 505 So.2d 592 (Fla. 2d DCA 1987), aff'd, 521 So.2d 101 (Fla. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). This opinion will not restate the additional facts provided in those opinions.
Between March 22 and March 24, 1988, the issue of compensation for both nursery owners was tried by jury. The jury returned a verdict for Mid-Florida Growers, which awarded $739,462.00 for the value of the destroyed nursery stock. Additionally, the jury awarded $105,717.00 as the "amount of any lost or retarded production of new stock" sustained by Mid-Florida. Since the Department had made a partial payment of $188,372.40 on April 9, 1985, to Mid-Florida, the lower court entered judgment for compensation in the amount of $966,177.95.[1] A similar verdict was rendered in favor of Himrod. The jury awarded Himrod $602,568.00 for the value of the destroyed nursery stock, and an additional $128,352.00 for lost production. The Department had previously paid Himrod $59,127.24. Thus, the lower court entered judgment in favor of Himrod for $977,281.00.
The Department presents three issues: First, it argues that the trial court erred in allowing the jury to consider evidence based upon market prices after the date of the taking. Second, assuming that future market prices were properly introduced into evidence, the Department argues that the plaintiffs' expert miscalculated the damages. Finally, the Department argues that damages for lost future production are not recoverable as a constitutional right.

I. THE CITRUS NURSERY GROWTH CYCLE
In order to evaluate this case, it is helpful to understand the process of growing new citrus stock. This is an unusual eminent domain case. The Department did not take a parcel of real property by inverse condemnation. Instead, the Department destroyed personal property.[2] In *1245 many respects, the nursery stock involved in this case is similar to the property along any assembly line in any factory. The Department essentially destroyed all component parts and finished products of the two nursery owners and prohibited them from starting up their factories for a period of weeks.
Each nursery in this case grows containerized product inside greenhouses. This is a relatively new method for starting citrus. It allows the nursery to avoid freeze damage to its stock and to receive the higher prices for its product which typically follow grove-damaging freezes. The containerized citrus is easier to handle and to plant than trees grown outdoors using the more traditional bare-foot method.
The nursery begins its assembly line by planting seeds in falts which contain approximately 100 cells. Most of the seeds germinate and produce seedlings. The plants are grown in the seedling stage for three to four months.
After the plants have reached the end of the seedling stage, they are transplanted into four-inch containers. They are grown in these containers for approximately another three to four months. This stage of growth is frequently referred to as the liner stage. The liners are grown until the stems are approximately pencil size.
The liners are grown strictly as root stock. The fruit they would bear is unacceptable. As a result, bud stock is removed from trees with desirable fruit. The buds are grafted to the liners to produce budded trees.
The final stage of production involves the budded trees. They are grown in the nursery for another six to nine months. The budded trees can be transplanted to six-inch pots or three-gallon containers. The larger pot allows for a larger tree, a longer shelf life, and a higher price.
The total time to produce a marketable tree varies from ten months to twenty-two months. On the average, it takes approximately sixteen months to produce a marketable budded tree.
A typical greenhouse, like any factory, has a maximum output. Mid-Florida's nursery, for example, starts approximately 35,000 trees every quarter. As a batch of seedlings moves up the production line to become liners, a new batch of seedlings is begun. The total production capacity of the Mid-Florida greenhouse is approximately 140,000 seedlings, liners, and budded trees. The Department destroyed all of the product within the nursery in all three stages of development.

II. THE DEPARTMENT'S THREE-FOLD EXERCISE OF POLICE POWERS
Analytically, this case involves three distinct exercises of police power. First, the Department entered an emergency order in September 1984, which placed a general quarantine upon nursery sales. The quarantine remained in effect until April 1, 1985. The quarantine had a significant impact upon a wide range of citrus nurseries and citrus groves. During the quarantine, citrus nursery stock could not be legally sold in Florida. We emphasize that no court in this case has ruled that the quarantine between September 1984 and April 1985 constituted a taking. We do not rule upon this constitutional question. We simply observe that the issue is unresolved. The constitutionality of a temporary, nondestructive quarantine to protect a major state industry would require a substantially different analysis than the analysis involved for the destruction of these healthy citrus trees. See Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla.), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981); Morton v. Gardner, 513 So.2d 725 (Fla. 3d DCA 1987); Flake v. State, Dep't of Agriculture, 383 So.2d 285 (Fla. 5th DCA 1980).
Second, the Department entered specific "immediate final orders" designating Mid-Florida and Himrod as "eradication areas." By virtue of these orders, their healthy citrus stock was burned. This specific action has been declared a taking, even though it was a valid exercise of police power. State, Dep't of Agriculture v. *1246 Mid-Florida Growers, 521 So.2d 101 (Fla. 1988).
Finally, the Department, in conjunction with the United States Department of Agriculture, conducted a decontamination of the greenhouses after the citrus stock was burned. Although the Department burned the citrus stock in this case by mid-October 1984, the decontamination was not completed until mid-December 1984. Thus, at a minimum, the nursery owners were temporarily shut down for approximately two months after the burning of their healthy stock because of the decontamination action.[3]
The trial court's order determining liability did not expressly find the decontamination process to be a taking. Because the plaintiffs did not amend their complaint to seek damages for lost production until after the bench trial on liability, the trial court had no occasion to analyze carefully the issue of decontamination as a taking.
From the record in this case, it appears that the decontamination process only occurred in nurseries where the Department also destroyed the stock under an "immediate final order." It is at least possible that the Department could have disrupted a nursery's production to decontaminate the nursery without destroying healthy citrus plants. Thus, the act of decontamination may be analyzed as either an action incidental to the destruction of the citrus plants or as a separate action placing a temporary restriction on the nursery's production. In either case, the decontamination is only relevant to the claim for lost production.

III. THE TWO COMPETING THEORIES OF FULL COMPENSATION
Both sides agree that the nursery owners are entitled to "full compensation" for the destruction of their citrus product. Art. X, § 6, Fla. Const. As might be expected, however, the two sides provide dramatically different approaches to full compensation.
Concerning the destroyed citrus, the evidence establishes the numbers and types of citrus burned at each nursery, as follows:

 Mid-Florida Himrod
Seedlings 30,000 56,800
Liners 22,404 62,004
4" Budded 45,576 24,790
3-Gal. Container 40,000 0
 _______ _______
Total Destroyed 137,980 143,594

The Department argues that the seedlings should be valued at a cost factor of approximately $.19 each, plus a profit of 57.6%. Prior to the quarantine, there is evidence that a market existed for seedlings. The Department's evaluation of "full compensation" for the seedlings is consistent with testimony establishing a market price of $150.00 to $200.00 per thousand for seedlings in the fall of 1984.
For the liners, the Department again uses a cost factor of $1.025 per liner, with a 57.6% mark-up for profit. There is no evidence that a market existed for liners in the fall of 1984.
Finally, the Department suggests that full compensation for the budded trees should be $3.50 for each four-inch pot, and $6.75 for each three-gallon container. These prices were established by the August 1984 market. In total, the Department's theory supported an award to Mid-Florida of $438,387.30, and an award to Himrod of $173,344.05.[4]
Because of the quarantine, there was no legal market in October 1984 for the nurseries' seedlings, liners, or budded trees. Thus, the Department's analysis is based upon a hypothetical market in October 1984, with prices derived from the earlier fall market.
The nursery owners reject the analysis based upon earlier prices. Instead, they base their analysis upon the next true market which existed in April 1985.
*1247 Because of a freeze in December 1983, the price of budded trees had gradually increased during 1984. When a second major freeze occurred in January 1985, there was an immediate increase in the demand for young trees. As a result, trees in four-inch containers which would have sold for $3.50 in August 1984, sold for approximately $4.50 in April 1985. This increase in market price lasted for approximately one year. The nursery owners' theory of damage allows them to receive the benefit of the January freeze which they could not have predicted in October.
If the nursery owners' product had not been destroyed in October 1984, it would have continued to grow during the quarantine. Thus, they theorize that the seedlings and liners could have been sold as budded trees between April 1985 and April 1986. Additionally, the nursery growers hypothetically transplanted some of their trees from four-inch containers to six-inch, or three-gallon containers to receive longer shelf life and a higher price.
Mid-Florida calculates a total market revenue for its hypothetically matured nursery stock in the market after April 1985 of $790,910.00. Its expert economist then deducts from this gross amount for various cost items which were avoided because of the destruction of the crop. He does not, however, deduct for fixed costs such as mortgage payments, taxes, and unavoidable labor expense. Mid-Florida suggests this "net value cost" of $739,462.00 as full compensation. For Himrod, a similar analysis suggests full compensation of $696,173.00. The jury accepted the nursery owners' analysis in total and rejected the Department's analysis.
Concerning damages for lost production, the Department simply maintains that no such damages were legally awardable. The nursery owners argue that a growing cycle was sixteen months in length and thus, they lost one-sixteenth of their production for each month of delay. They assume that the production lost in the fall of 1984 would have resulted in sales in the winter of 1986. They further assume that 60% of these sales would have involved four-inch containers and 40% would have utilized six-inch containers. They reduce their gross revenue by the net cost saved per month on these hypothetical citrus trees. For Mid-Florida, this analysis results in a net loss of $35,239.00 per month. The jury's award to Mid-Florida is precisely three months' lost production. Himrod's analysis was similar. Its monthly net loss totals $36,672.00. The jury's award to Himrod is exactly three and one-half times this monthly loss.

IV. EVIDENCE OF A FUTURE MARKET IS RELEVANT
In a typical eminent domain proceeding, the date of the trial, or the date upon which title passes, is utilized as the date to measure compensation. § 73.071(2), Fla. Stat. (1987). Evidence of a future increase in value is generally impermissible. "To permit such evidence would open a flood-gate of speculation and conjecture that would convert an eminent domain proceeding into a guessing contest." Yoder v. Sarasota County, 81 So.2d 219 (Fla. 1955).
While recognizing contrary authority in other states, the Fifth District has held that compensation in an inverse condemnation proceeding, as a general rule, should also be determined on the date of the taking. County of Volusia v. Pickens, 439 So.2d 276 (Fla. 5th DCA 1983); Crigger v. Florida Power Corp., 469 So.2d 941 (Fla. 5th DCA 1985), appeal after remand, 509 So.2d 1322 (Fla. 5th DCA 1987), review denied, 519 So.2d 986 (Fla. 1987). In the Pickens case, the county took private land by inverse condemnation on August 18, 1976. The trial court allowed the jury to determine damages on the date of the trial which took place in 1981. The Pickens' property had more than doubled in value in that five-year period.
The appellate court did not permit the Pickens to receive compensation based upon the rapid appreciation of their property after the taking. Instead, the Pickens were limited to the value of their property at the time of the taking plus prejudgment interest. The court recognized that inverse *1248 condemnation proceedings are not identical to eminent domain proceedings and stated: "This rule might not be controlling in exceptional situations, ... but it should prevail in most cases." Pickens, 439 So.2d at 277. We agree with the reasoning of our sister court, but find that an exceptional circumstance does exist in this case.
In light of the state quarantine, the jury in this case was authorized to find that a market did not exist for the nursery owners' product in October 1984. Thus, the jury had no practical option but to consider evidence of earlier or later market prices. In this case, the lower court did not compel the jury to adopt the future market approach. Instead, the jury instructions permitted the jury to "value the nursery stock in accordance with the highest and most profitable use for which it is reasonably adaptable and needed, or is likely to be needed, in the near or foreseeable future." The jury was instructed that it could consider either the future market value or the market value at the time of the destruction.
Although fair market value is an important element in determining compensation, it is not the exclusive measure of full compensation in Florida. Jacksonville Express. Auth. v. Henry G. DuPree Co., 108 So.2d 289 (Fla. 1958).
We feel our constitutional provision for full compensation requires that the courts determine the value of the property by taking into account all facts and circumstances which bear a reasonable relationship to the loss occasioned the owner by virtue of the taking of his property under the right of eminent domain.
Id. at 291.
In a condemnation proceeding, the value of the property is an issue wisely left to the jury's province. Behm v. Div. of Admin., State Dep't of Transp., 336 So.2d 579 (Fla. 1976). The jury cannot make an award outside the evidence, but it should be free to evaluate all evidence which assists in establishing a value and which does not result in speculation.
In this case, the "future" market is in the past. The jury did not need to speculate or to rely upon mere promises. See Belvedere Dev. Corp. v. Dep't of Transp., 476 So.2d 649, 653 (Fla. 1985). The nursery owners' analysis is similar to a landowner's analysis, which appropriately includes an increase in value at the time of taking to reflect the anticipation of the proposed project. Dep't of Transp. v. Nalven, 455 So.2d 301 (Fla. 1984).
In Lee County v. T & H Associates, Ltd., 395 So.2d 557 (Fla. 2d DCA 1981), this court considered a similar case. In T & H Associates, the county condemned a parcel of land as a site for a sewage disposal facility. At the time of the taking, the land was leased and was planted in watermelon. The plants were only three or four inches high at the time of the taking. Although the watermelon crop should have been evaluated as a portion of the realty, the lower court treated it as if it were separate, personal property. This court ruled that the erroneous treatment of the watermelons as personal property was harmless since the same evidence would have been necessary in order to determine the value of the leasehold. This court permitted the owner of the lease to present evidence of the future market and his expectations for a future crop. In determining the leasehold damages, the costs which were not incurred in growing the watermelon to harvest were deducted from the future revenues. As in this case, the "future" market had already occurred at the time of trial and the jury did not need to speculate upon the future market price.
While T & H Associates limited its holding to a crop with a growing period of no more than one year, we do not hesitate to approve the same approach in this case. Most of the nursery stock would have been marketed well within a one-year period. The fact that a small percentage of the stock could have been sold twelve to sixteen months after the taking should not require a different analysis. Under the facts of this case, the method does not result in mere speculation and did present relevant evidence. Asgrow-Kilgore Co. v. Mulford Hickerson Corp., 301 So.2d 441 (Fla. 1974).
*1249 In T & H Associates, the future market analysis was permitted because there was no market for the watermelon crop in a partial state of development. Id. at 560. In this case, the Department argues that a market existed for seedlings and for budded trees at the time of the taking and, thus, T & H Associates should not apply. While there is evidence of a market for seedlings and budded trees a month preceding the taking, there is also evidence that the state quarantine had effectively eliminated the nurseries' market in October 1984. Thus, the lower court did not err in allowing the jury to consider both the past and the future market.
Finally, it remains to be decided whether the evidence of a future market is admissible to prove the value of a hypothetical market at the time of the taking in October 1984, or whether the jury is authorized to award damages as of the time of the spring market. A willing buyer of the nursery in October 1984 would not have anticipated the January 1985 freeze and the resulting higher prices. Thus, if the evidence of the spring market is relevant only to an October compensation date, it should result in smaller awards to the nursery owners than if the jury is simply free to award full compensation based upon the spring prices.
In T & H Associates, the court apparently allowed the taking to be measured on the future date. In this case, the spring prices are not drastically higher than the fall prices. Most of the nursery stock was intended for sale in the spring market. The competitors of these nursery owners, in fact, received the higher spring prices for their healthy nursery stock. It does not seem unfair to provide these nursery owners with the same full compensation which their competitors received in the intended market.
A jury would need to engage in greater speculation to determine an October price based upon evidence of the spring market than to simply award compensation based upon the spring market. Under the exceptional facts of this case, we hold that a jury may properly award damages at the time of the stock's expected sale in the spring market, rather than at the time of the actual taking.[5]

V. CALCULATING DAMAGES IN THE FUTURE MARKET
The parties agree upon the general rule for calculating damages caused by the loss of an immature crop. In T & H Associates, this court approved a method which allowed the owner to present evidence of the total market value of the crop at the time of harvest. From this total market value, the owner was required to deduct labor and other expenses which would have occurred in bringing the crop to market, but did not occur due to the taking. T & H Associates, 395 So.2d at 558-59. The method used in T & H Associates is similar to the method utilized in other condemnation cases. United States v. 546.734 Acres of Land in Montgomery County, Pa., 143 F.2d 408 (3d Cir.Pa.), cert. denied, 323 U.S. 716, 65 S.Ct. 43, 89 L.Ed. 576 (1944); Daily v. United States, 90 F. Supp. 699, 116 Ct.Cl. 723 (1950); United States v. 729.773 Acres of Land in Honolulu, 531 F. Supp. 967 (D.C.Haw. 1982); 4 P. Nichols, The Law of Eminent Domain § 13.21 (Rev. 3d Ed. 1985).
While the parties agree on the general rule, they disagree upon the expenses which must be deducted from the total market value. The grove owners wish to deduct only those expenses which were actually saved following the taking. The Department argues that the unavoidable fixed expenses such as mortgage payments, taxes, and essential labor, should also be deducted. The Department argues that the *1250 failure to deduct the fixed expenses somehow results in compensation for consequential damages.
The purpose behind such damage calculations is to restore the property owner "to the position he would have been in, but for the taking of his crops." 729.773 Acres, 531 F. Supp. at 975. A comparison of the damaged nursery owners to their competitors establishes that the fixed expenses must not be deducted in calculating full compensation.
Assume that both Damaged Nursery and its competitor, Undamaged Nursery, had nursery plants which would have sold in the spring market for $1,000,000.00. Assume that each has fixed costs between October 1984 and April 1985 of $500,000.00. Finally, assume that the variable costs which Damaged Nursery could avoid and which Undamaged Competitor expended between October and April are $200,000.00. If the court accepted the Department's analysis, the following injustice would occur:

 Damaged Nursery Undamaged Competitor
 Total Market Value $1,000,000 $1,000,000
 Department's Deductions 700,000 0
 __________ __________
 Revenue After Deductions 300,000 1,000,000
 Variable Expenses 0 200,000
 Fixed Expenses 500,000 500,000
 __________ __________
 Net Profit or (Loss) (200,000) 300,000

Since both nursery owners actually incur the fixed expenses, the Department's theory effectively deducts fixed expenses twice from Damaged Nursery's gross revenues. Instead of placing Damaged Nursery in the same position it would have been in but for the taking, the Department's theory places Damaged Nursery in a substantially worse condition.
The Department was free to question the grove owners' analysis in the lower court. Whether the grove owners deducted each and every avoidable expense in their analysis is subject to dispute. That dispute, however, goes to the weight of the evidence and the credibility of the plaintiffs' expert. It was a matter properly resolved by the jury. Behm; Slacter v. City of St. Petersburg, 449 So.2d 1006 (Fla. 2d DCA), review denied, 458 So.2d 271 (Fla. 1984).

VI. COMPENSATION FOR LOST PRODUCTION
The nurseries owners' claim for lost or retarded production of new stock can be analyzed by two separate methods. The claim for lost production arises out of the interruption of production caused by the Department's exercise of police power. This interruption occurred for a short period during the burning process, and for a longer time during the decontamination process. The owners argue that the interruption can be viewed as "incidental" to the burning process. Under this method, the interruption creates consequential damages arising out of the taking of personal property. In the alternative, the owners analyze the decontamination as a separate action which arguably constituted a temporary taking of the entire nursery.
If the claim for lost production is analyzed as incidental to the taking of the personal property, these damages clearly are not recoverable as compensation under article X, section 6, of the Florida Constitution. The constitutional right to receive full compensation under eminent domain is not a right to receive general damages. The taking of the citrus plants authorizes the grove owners to receive full compensation for the plants. While the owners are entitled to receive "prospective revenue" which is directly derived from the plants themselves, they are not entitled to receive general damages arising from the "business operated at a particular location." T & H Associates, 395 So.2d at 560.
The claim for lost production is a claim for consequential, business damages. It is well established that "the right to business damages is a matter of legislative grace, not constitutional imperative." Jamesson v. Downtown Dev. Auth., 322 So.2d 510 (Fla. 1975). See also State, Dep't of *1251 Transp. v. Fortune Fed. Sav. & Loan Ass'n, 532 So.2d 1267 (Fla. 1988); Texaco, Inc. v. Dep't of Transp., 537 So.2d 92 (Fla. 1989). The legislature has not graced these nursery owners with a statute authorizing business damages. Section 73.071(3)(b), Florida Statutes (1987), allows for severance damages to remaining property where the state takes less than the entire property. That statute is not applicable to this taking of personal property.[6]
The nursery owners argue that such consequential damages would be available in a typical tort action against a third person who negligently destroyed their nurseries. See R.A. Jones & Sons, Inc. v. Holman, 470 So.2d 60 (Fla. 3d DCA 1985), review dismissed, 482 So.2d 348 (Fla. 1986). While this may be correct, they have only brought an action for inverse condemnation and not an action in tort. Had the nursery owners filed a negligence action against the Department, the action would have been governed by the limitations in section 768.28, Florida Statutes (1984). Any judgment over $100,000.00 per person could not have been collected absent legislative action. § 768.28(5), Fla. Stat. (1984). Unless the grove owners could establish operational as compared to planning-level errors, their tort action would have been barred by sovereign immunity. Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979). In this case, we are measuring the compensation which the Department, and ultimately the taxpayers, must pay to the nursery owners as a constitutional obligation. We are not measuring the damages which could be available if the legislature waived sovereign immunity or created a more generous statutory framework.
If the claim for lost production is viewed as a claim arising out of the temporary taking of the nursery, the nursery owners are still precluded from recovering the damages awarded by this jury. In Florida, the viability of a claim under inverse condemnation for a "temporary taking" is open to question. In Hillsborough County v. Gutierrez, 433 So.2d 1337, 1340 (Fla. 2d DCA 1983), this court stated that "Florida law does not recognize a temporary `taking.'" In State, Department of Transportation v. Donahoo, 412 So.2d 400 (Fla. 1st DCA 1982), the First District also held that a taking requires a permanent invasion of the land. The facts involved in those cases, however, are not comparable to the facts in this case. In Morton v. Gardner, 513 So.2d 725 (Fla. 3d DCA 1987), review denied, 525 So.2d 879 (Fla. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988), the Third District held that an action for inverse condemnation did not arise from a temporary taking of a vessel for 124 days. The vessel was confiscated under the Florida Contraband Forfeiture Act, section 932-701-.704, Florida Statutes (1983). The owner attempted the inverse condemnation action after the forfeiture petition was dismissed with prejudice.
In First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), the Court held that a land use regulation which temporarily deprived a landowner of "all use" of the land constituted a temporary taking under the Fifth and Fourteenth Amendments to the United States Constitution for which the owner was entitled to compensation. In that case, the County of Los Angeles had adopted an interim ordinance prohibiting all construction along a creek following a flood. The Court ruled that the county was obligated to pay the landowner for the value of the use of the land during the period in which the temporary ordinance precluded all use of the land. Id. 107 S.Ct. at 2388.
The distinctions between the Florida case law on temporary takings and the United States Supreme Court's discussion in First English may be a matter of rhetoric rather than substance. The essential question is whether the governmental action impairs a recognized property right for a sufficient period of time, to a sufficient degree, and without sufficient justification as to create *1252 a "taking." The line between a taking and a mere impairment for which the damages are damnum absque injuria depends upon the facts of each case. See Village of Tequesta v. Jupiter Inlet Corp., 371 So.2d 663 (Fla.), cert. denied, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 377 (1979).
In this case, the nursery owners did not seek relief under the United States Constitution. They did not allege that "all use" of their property was denied. While the destruction of the nursery plants has been declared a taking, no court has found the decontamination to be a temporary taking of the nursery owners' real property.
It remains to be seen upon remand whether the nursery owners can allege that "all use" of their property was denied under circumstances constituting a taking rather than a mere impairment. See, e.g., Zilber v. Town of Moraga, 692 F. Supp. 1195 (N.D.Cal. 1988). If such a claim can be established, the nursery owners are entitled to recover the fair market value of their land for the period of the restriction. Wheeler v. City of Pleasant Grove, 833 F.2d 267 (11th Cir.1987). The method used by the nursery owners to establish their damages for lost production in the last trial would not appear to accurately measure the damages authorized by First English.

VII. CONCLUSION
We remand this case for the entry of a partial final judgment awarding the nursery owners compensation for the loss of their existing nursery stock plus prejudgment interest from April 1, 1985. We reverse the judgment awarding compensation for the lost or retarded production of new stock. Upon remand, the nursery owners are entitled to amend their complaint in an effort to allege a temporary taking under the theory enunciated in First English and to seek the additional damages authorized by that theory.
We recognize that this decision expressly construes a provision of the state constitution. Because the issues resolved in this appeal will undoubtedly affect other nursery owners and will require the expenditure of substantial tax dollars, we certify the following questions to the Florida Supreme Court as ones of great public importance:
1. WHETHER A CITRUS NURSERY OWNER WHOSE STOCK IS DESTROYED BY THE STATE DURING A QUARANTINE IS ENTITLED TO MEASURE ITS LOSS AS OF THE DATE OF THE REOPENED MARKET?
2. WHETHER A CITRUS NURSERY OWNER IS ENTITLED TO DAMAGES FOR LOST PRODUCTION SUSTAINED AS AN INCIDENT TO THE DESTRUCTION OF HEALTHY CITRUS PLANTS AND THE DECONTAMINATION OF THE BUSINESS PREMISES?
Reversed in part, affirmed in part, and remanded to the lower court for further proceedings consistent herewith.
DANAHY, A.C.J., and FRANK, J., concur.
NOTES
[1] This amount includes prejudgment interest accruing from October 7, 1984. The Himrod judgment also includes prejudgment interest.
[2] The parties to this action agree that the containerized plants which were destroyed in this case are personal property. Personal property may be taken by inverse condemnation. Flatt v. City of Brooksville, 368 So.2d 631 (Fla. 2d DCA 1979). Citrus agriculture demonstrates the difficulty in distinguishing between fructus naturales and fructus industriales. Summerlin v. Orange Shores, Inc., 97 Fla. 996, 122 So. 508 (1929); 63 Am.Jur.2d Property § 19, p. 251 (1984). Because these citrus plants were never planted in the ground, it seems clear that the destroyed property is personal property. If this case had involved a bare-root nursery in which the trees were grown for more than a year and were planted in the ground, the trees might arguably be classified as real property. We doubt that this distinction should result in disparate treatment for nurseries whose stock was destroyed by the Department.
[3] The nursery owners presented evidence that the temporary shut down lasted as long as four months.
[4] To these amounts, the state would add prejudgment interest and set off its earlier voluntary payments.
[5] Prejudgment interest under this holding, however, should also run from the date of the future market and not from the date of the taking. The nursery owners are not entitled to measure their compensation in April 1985 and receive prejudgment interest from an earlier date. While the Department did not expressly object to the lower court's decision to calculate prejudgment interest from October 7, 1984, it did repeatedly object to the plaintiffs' future market theory. Since prejudgment interest can be calculated by the lower court without additional jury proceedings, this error should be corrected by the lower court upon remand.
[6] Even if the facts in this case involved nursery trees planted in the ground, we are doubtful that this statute would allow for these business damages as severance damages to the remaining property.