570 So.2d 892 (1990)
DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, Petitioner,
v.
MID-FLORIDA GROWERS, INC. and Himrod & Himrod Citrus Nursery, Respondents.
No. 74046.
Supreme Court of Florida.
September 27, 1990.
Rehearing Denied December 19, 1990.
*893 Robert A. Butterworth, Atty. Gen., Beverly S. McLear and Desmond V. Tobias, Asst. Attys. Gen., Tallahassee, and Parker D. Thomson and Sanford L. Bohrer of Thomson, Muraro, Bohrer and Razook, P.A., Miami, Special Asst. Attys. Gen., for petitioner.
M. Stephen Turner and David K. Miller of Broad & Cassel, Tallahassee, for respondents.
EHRLICH, Justice.
We have for review Department of Agriculture & Consumer Services v. Mid-Florida Growers, Inc., 541 So.2d 1243 (Fla. 2d DCA 1989), in which the Second District Court of Appeal certified two questions as presenting matters of great public importance. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
Pursuant to United States Department of Agriculture and Florida Department of Agriculture and Consumer Services (Department) citrus canker regulations, Himrod & Himrod Citrus Nursery (Himrod) and Mid-Florida Growers, Inc. (Mid-Florida) were designated "exposed" nurseries in September, 1984, meaning they had been subjected to citrus canker infection or infestation because of location or contact with xanthomonas campestris pv. citri. Fla. Admin. Code Rule 5B-49.001(7) (1987). From October 7 to October 19, 1984, the Department burned the entire nursery stock at nurseries operated by Mid-Florida and Himrod. Prior to destruction, respondents had citrus plants in various stages of development: seedlings, liners, budded trees in 4" citra pots, and in Mid-Florida's case, budded trees in 6" and 7.5" (three gallon) citra pots.
A quarantine was in effect on the date the nursery stock was destroyed. Emergency Rule 5BER84-8 described the "quarantined areas" as all countries, territories, states, counties, cities, farms, nurseries, urban properties, packinghouses, florists, or portions thereof, found to be infected or infested with citrus canker, or so located that it is reasonable to assume that infection or infestation is likely to have occurred, and certain described portions of Polk County specifically. This emergency order was entered by the Department in September 1984 and remained in effect until April 1, 1985. As the district court below noted, "[t]he quarantine had a significant impact upon a wide range of citrus nurseries and citrus groves. During the quarantine, citrus nursery stock could not be legally sold in Florida." Mid-Florida Growers, 541 So.2d at 1245.
Mid-Florida and Himrod filed an inverse condemnation suit, contending that the Department's destruction of the nursery stock constituted a taking which required payment of full and just compensation. A trial was held on the liability issue alone. The trial judge ruled that the burning of the *894 citrus stock constituted a taking and that the nursery owners were entitled to full compensation under article X, section 6, Florida Constitution. That decision was affirmed by both the Second District Court of Appeal and this Court. Department of Agric. & Consumer Servs. v. Mid-Florida Growers, Inc., 505 So.2d 592 (Fla. 2d DCA 1987), approved, 521 So.2d 101 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
The issue of compensation for both nursery owners was tried by jury between March 22 and March 24, 1988. The jury awarded Mid-Florida $739,462.00 for the destroyed nursery stock and $105,717.00 for the "amount of any lost or retarded production of new stock." Himrod was awarded $602,568.00 for the destroyed nursery stock and $128,352.00 for lost production. These awards to Mid-Florida and Himrod were reduced by $188,372.40 and $59,127.24, respectively, which amounts represented partial payments previously made to the nurseries under the joint USDA/Department compensation program. The trial court thus entered judgment in the amount of $966,177.95 for Mid-Florida and $977,281.00 for Himrod, which included prejudgment interest accruing from October 7, 1984.
The Second District Court of Appeal affirmed the award of compensation for the destroyed nursery stock and held that the jury could properly award damages at the time of the stock's expected sale in the spring market rather than at the time of the actual taking. The district court also concluded that the prejudgment interest should run from the date of the future market and not from the date of the taking. The district court reversed the award for "lost production," concluding that it represented a claim for consequential business damages which may only be awarded as a matter of legislative grace. The district court authorized the nursery owners to file additional pleadings upon remand in the lower court alleging that the quarantine upon replanting imposed after destruction constituted a temporary taking. The district court then certified the following questions:
1. Whether a citrus nursery owner whose stock is destroyed by the state during a quarantine is entitled to measure its loss as of the date of the reopened market?
2. Whether a citrus nursery owner is entitled to damages for lost production sustained as an incident to the destruction of healthy citrus plants and the decontamination of the business premises?
Mid-Florida Growers, 541 So.2d at 1252.

VALUATION OF DESTROYED NURSERY STOCK
The basic position of the respondents in this case, which was permitted by the trial court and accepted by the jury, is that they were entitled to receive the market value of the nursery stock destroyed, not as such stock existed at the time of destruction, but as it would have been at the time the nurseries would have expected to sell it had it not been destroyed. The respondents contend that this approach to valuing property, which can generally be described as a "prospective net revenue" approach, is appropriate when the property consists of a growing crop and no market exists for the crop on the date of destruction either because it is immature or because the market has been suspended by the Department's quarantine. The respondents generally base their analysis upon the next true market which existed after the quarantine was lifted, which was in April 1985. As summarized by the district court:
If the nursery owners' product had not been destroyed in October 1984, it would have continued to grow during the quarantine. Thus, they theorize that the seedlings and liners could have been sold as budded trees between April 1985 and April 1986. Additionally, the nursery growers hypothetically transplanted some of their trees from four-inch containers to six-inch, or three-gallon containers to receive longer shelf life and a higher price.
Id. at 1247.
The Department contends that the nursery owners are not entitled to measure loss as of the date of the reopened market. *895 At trial, the Department argued that if no market existed at the time of taking, the applicable fair market values for the various types of property are those closest in time without distortion, which in this case were the August 1984 prequarantine prices. The Department also argues that with respect to nursery stock for which there was a market at the time of destruction, the jury must determine a value for that type of stock, rather than hypothetically valuing as if the stock continued to grow during the quarantine period. As to stock for which no market existed on the date of taking or August 1984, the Department contends that the nurseries should receive the fair market value expected on the date of taking for the product into which such unmarketable nursery stock would have grown at the first date it could have been sold.
The Department correctly notes that the "just and full compensation" due to one whose property has been taken is generally the fair market value of the property at the time of the taking. See First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). This Court has previously recognized, however, that fair market value, although important, is not an exclusive standard. Rather, it is merely a tool to assist in determining what is full or just compensation. Jacksonville Expressway Auth. v. Henry G. Du Pree Co., 108 So.2d 289 (Fla. 1958). As this Court stated in Dade County v. General Waterworks Corp., 267 So.2d 633, 639 (Fla. 1972), "[t]he conclusion to be drawn is simply that the proper valuation method or methods for any given case are inextricably bound up with the particular circumstances of the case."
In the present case, we perceive that there are two possible classifications of the destroyed nursery stock for purposes of valuation. The first is nursery stock which is intrinsically unmarketable; in other words, stock that is at a growth stage for which there is no market due to immaturity. The second would encompass all nursery stock not included in the first class. It is presumed that if stock at a particular growth stage does not fall into the first class, it would be at a stage for which there is a market.
We first address permissible methods for determining just compensation for nursery stock which was not marketable at the time of taking due to immaturity. In Department of Agriculture & Consumer Services v. Polk, 568 So.2d 35 (Fla. 1990), which also involved the issue of compensation for destroyed citrus nursery stock, we considered the question of what valuation method or methods may properly be considered by the jury in determining full compensation when the property taken is an immature growing crop for which there is no market at the time of destruction. As we noted in Polk:
In Lee County v. T & H Associates, 395 So.2d 557 (Fla. 2d DCA 1981), the Second District Court of Appeal held that the trial court did not err in allowing evidence on the prospective net revenue of a watermelon crop located on a parcel of condemned land when the crop was only partially developed at the time of taking so that there was no market. We agree with the court in Lee County that when there is no market at the time of the taking due to the crops' partial state of development, it is necessary to consider other evidence bearing on value. We also conclude that the prospective net revenue which could have been derived from the crop at maturity is a proper measure of valuation.
At 42. The stock of the nurseries in the case at bar was grown in greenhouses, whereas Polk Nursery was a field nursery which purchased seedlings from outside sources and planted them in the field where the budwood was grafted onto the liner after approximately five to six months. There was testimony in Polk that there was no market for these types of nursery stock, grown in the field, until the liners matured. Thus, we concluded that the prospective net revenue which could have been derived from the crop at maturity is a proper measure of valuation.
*896 In the present case, conflicting testimony was presented with respect to the stages at which nursery stock grown in greenhouses is marketable. Thus, the prospective net revenue which could have been derived from the crop at the earliest hypothetical marketable stage attainable subsequent to the taking is a proper measure of valuation for presentation to the jury. A determination of whether a market does or does not exist for citrus nursery stock at any particular stage of growth is a question of fact to be decided by the jury after presentation of evidence directed to the issue by the parties.
In contrast to Polk, the case at bar presents the additional circumstance of absence of a market on the date of taking due to the existence of the quarantine. The respondents contend that because they could not actually sell any of their stock on the date of taking due to the quarantine, postquarantine values should be awarded on the basis that the nursery stock hypothetically continued to grow through the entire term of the quarantine so that all of the destroyed nursery stock, regardless of marketability absent the quarantine, would be valued as mature budded trees.
We reject the respondents' argument that the existence of the quarantine permits this approach to valuation. The "prospective net revenue" approach to valuing growing crops, set forth in Lee County v. T & H Associates, 395 So.2d 557 (Fla. 2d DCA 1981), and adopted by this Court in Polk, was determined to be a proper measure of compensation when there is no market for the growing crop on the date of taking due to the fact that the crop is immature. Although there may be conditions other than immaturity which would render such a method of valuation applicable, we conclude that the existence of the quarantine in the case at bar is not such a condition. As noted by the Third Circuit Court of Appeals:
The basis of compensation is the value of the unmatured crop at the time it is destroyed. But since it is not customary to buy or sell growing crops as such, no effective market value, in this sense, ordinarily exists. The formula adopted has been to take evidence on the probable yield and value of the crop when harvested at maturity and the cost of further care and cultivation, harvesting and marketing the crop, in order to determine the actual realizable value of the crop when destroyed; or what the crop when harvested would have brought, less the prospective cost of cultivation, harvesting and marketing. In allowing such evidence, many decisions state that the market value of the yield to be considered is the market value "when", "at the time" or "at" maturity or harvesting and gathering of the crop. This limitation is a reasonable one, for, it must be remembered, the general rule is that the measure of damages is the value of the crops at the time of injury or destruction. Since as a practical matter that value cannot be actually determined, the nearest time thereafter when a market value can be placed upon the crops is considered.

United States v. 576.734 Acres of Land, 143 F.2d 408, 409-10 (3d Cir.) (footnotes omitted; emphasis added), cert. denied, 323 U.S. 716, 65 S.Ct. 43, 89 L.Ed. 576 (1944).
Because the goal is to value the immature stock at the time it was destroyed, the earliest point subsequent to destruction at which the stock would have been marketable is a reasonable limitation. It is unnecessary to hypothetically grow the stock throughout the entirety of the quarantine to full maturity when a particular crop or type of stock has more than one marketable stage.[1]
*897 The effect of the quarantine upon valuation of the nursery stock is minimal. If the quarantine were still in effect at the point in time at which the destroyed immature stock would have first reached a marketable stage of growth, then postquarantine values for nursery stock at the hypothetical marketable stage of growth may be introduced. Prequarantine values may also be introduced. It was error to permit introduction of evidence by respondents as to the hypothetical stages of growth the destroyed nursery stock would have attained upon termination of the quarantine, based solely upon the existence of the quarantine. The error was compounded in the present case by allowing respondents to contend that many of the plants would be retained even past the lifting of the quarantine and transferred into larger pots in order to obtain a longer shelf life and a higher price.[2]
As to nursery stock which was at a marketable stage of growth on the date of destruction, the only factor hindering valuation was the existence of the quarantine on that date. Because nursery stock could generally not be sold in Florida on the date of the taking at issue, there were no market prices on that date for presentation to the jury. The effect of the quarantine is to entitle a party to argue, and the jury to accept if it so chooses, that the proper value to place on the marketable stock destroyed is the price at which similar stock sells when the quarantine is lifted. The other party or parties will likewise remain free to argue that prequarantine prices reflect the proper value.[3]
Accordingly, in answer to the first certified question, we hold that if there is no market on the date of taking for the type or stage of stock destroyed due to immaturity, the nursery owner may introduce evidence of the prospective net revenue to be derived from that stock at the point closest in time to the taking when the stock would have reached a stage of maturity. If the quarantine is still in effect at this point in time, postquarantine values of nursery stock at the hypothetically reached marketable stage may be introduced. As to nursery stock which was marketable on the date of destruction but for the quarantine, values as of the date of the reopened market are admissible to value such stock at its particular stage of growth at the time of destruction.
The Department asserts that if the prospective net revenue approach of determining full compensation is used, all expenses which would have been necessary to continue the cultivation and marketing of the crop after its destruction must be deducted to determine what the probable net yield would have been. The Department contends that the respondents' expert did not subtract all appropriate costs. As summarized by the district court below: "The grove owners wish to deduct only those expenses which were actually saved following the taking. The Department argues that the unavoidable fixed expenses such as mortgage payments, taxes, and essential labor, should also be deducted." Mid-Florida Growers, 541 So.2d at 1250. We agree with the district court's analysis.
Since both nursery owners actually incur the fixed expenses, the Department's theory effectively deducts fixed expenses twice from [the respondents'] gross revenues.
... .
The Department was free to question the grove owners' analysis in the lower court. Whether the grove owners deducted *898 each and every avoidable expense in their analysis is subject to dispute. That dispute, however, goes to the weight of the evidence and the credibility of the plaintiffs' expert. It was a matter properly resolved by the jury.
Id.
We also reject the Department's argument that if the future market is relevant, either through the prospective net revenue approach or through introducing postquarantine values for destroyed marketable stock, it is relevant only as it was expected to be at the time of taking. Because of freezes which occurred in December 1983 and January 1985, demand for young trees had increased. Due to this increased demand, trees in four-inch containers which would have sold for $3.50 in August 1984, sold for approximately $4.50 in April 1985. We agree with the district court that postquarantine values are admissible in the present case. As recognized by the Second District Court of Appeal in Lee County:
Theoretically, the value of the property at the time of the taking ought to reflect both the promise and the risk inherent in the growing of the crops based upon past experience rather than events which have not yet occurred. But the recitation of what actually happened in the market and of the weather conditions which actually prevailed is in this instance the best possible evidence available. It removes from doubt any speculation over what the market might be, and it takes into consideration whether the crop would have survived the balance of the winter. If a devastating freeze had occurred shortly after the taking, the county ought to have been permitted to demonstrate that the crop would have been wiped out anyway. By the same token why shouldn't Biggar and Kelly be allowed to show that, in fact, their crop would have survived? Court disputes should be decided upon the most reliable evidence available. Therefore, it was proper to permit evidence of the economic and weather conditions which actually prevailed subsequent to the taking.
395 So.2d at 561.
In the case at bar, we conclude that the postquarantine prices, which reflect an increased price due to freeze or other subsequently occurring conditions, are admissible. In this respect, we are in accord with the analysis of the district court below: A jury would need to engage in greater speculation to determine an October price based upon evidence of postquarantine market prices than to simply award compensation based upon postquarantine values. The Department of course remains free to introduce evidence which may well convince the jury that the value of the destroyed stock was lower than the prevailing postquarantine prices which reflected the effects of the freeze.
Finally, the Department raises a challenge to the jury instructions in conjunction with the above issues. The trial court instructed the jury, in relevant part, as follows:
You should determine full compensation of the Plaintiffs' destroyed nursery stock as of October 7, 1984, which is considered the date of taking. However, as further explained below, you need not determine market value as of this specific date if you find that the market for such nursery stock was non-existent or if the Plaintiffs would normally be expected to market their stock at a later time, in which events you may determine the market price at the time they reasonably planned to market or would have been able to market their stock.
... .
In determining the value of Plaintiffs' immature citrus nursery stock intended to be sold or used for commercial purposes, you may consider the value of such stock assuming it were brought to maturity and then sold. That is, you may consider the market value which Plaintiffs' immature seedlings and liners or young budded trees would have had as mature budded trees if they had not been destroyed.

*899 Alternatively, if you find that in spite of the destruction any of the immature stock referred to in this case had a market value at the time of destruction, then you may consider that value in determining full compensation.
We agree with the Department that the portion of the trial court's charge which stated that if the respondents would normally be expected to market their stock at a later time, the jury could determine the market price at the time they reasonably planned to market their stock, is erroneous. At trial, in response to the Department's evidence that a market did exist for greenhouse seedlings, respondents testified that although a market for greenhouse seedlings did exist, they personally did not engage in such market and the seedlings destroyed should therefore not be valued as seedlings, but as mature budded trees. This testimony should not have been admitted. In a condemnation proceeding, the subjective plans or intentions of the person whose property is taken are irrelevant; it is, in effect, a forced sale.
Valuation is generally based upon fair market value of the property taken, which is commonly defined as what a willing buyer would pay a willing seller, on the date of taking. If the property taken had consisted of real property, respondents would not have been able to contend and receive compensation on the basis that they had not intended to sell the property until a later date when its value was expected to increase. If the property taken had consisted of a personal residence, the owner would not have been permitted to argue and receive compensation on the basis that he had not intended to sell until he had renovated and made additions. That respondents did not generally market their product at any stage of growth other than mature budded trees, even though a market may exist for nursery stock at earlier stages of growth, is irrelevant. The person whose property is condemned may very well not be in the business of selling the type of property which was condemned.

COMPENSATION FOR LOST PRODUCTION OR TEMPORARY TAKING
Respondents contend that the burning and the order prohibiting production, otherwise referred to as the quarantine, were interrelated activities of the same canker eradication program and that the interruption can be viewed as "incidental" to the burning process. The respondents then argue that the nurseries "are not fully compensated unless the program's entire effect, i.e., all the actions connected with the taking, are considered." In the alternative, the respondents analyze the quarantine imposed for decontamination purposes as a separate action which allegedly constituted a temporary taking of the entire nursery.
We conclude that the trial court erred in permitting this alleged component of full compensation to be presented to the jury and that the damages awarded by the jury for lost or retarded production of new stock are therefore not sustainable under either analysis proffered by the respondents. As the district court below noted, if the claim for lost production is analyzed as incidental to the taking of the personal property, these damages are not recoverable as compensation under article X, section 6, of the Florida Constitution. The constitutional right to receive full compensation under eminent domain is not a right to receive general damages. The taking of the citrus plants authorizes the nursery owners to receive full compensation for the destroyed plants. With respect to this theory, the district court correctly stated:
The claim for lost production is a claim for consequential, business damages. It is well established that "the right to business damages is a matter of legislative grace, not constitutional imperative." Jamesson v. Downtown Dev. Auth., 322 So.2d 510 (Fla. 1975). See also State, Dep't of Transp. v. Fortune Fed. Sav. & Loan Ass'n, 532 So.2d 1267 (Fla. 1988); Texaco, Inc. v. Dep't of Transp., 537 So.2d 92 (Fla. 1989). The legislature has not graced these nursery owners with a statute authorizing business damages.
*900 541 So.2d at 1250-51. We accordingly answer the second certified question in the negative.
Respondents cite State Plant Board v. Smith, 110 So.2d 401 (Fla. 1959), and state that this Court "noted that an owner whose healthy plants were destroyed by a state program should be compensated `for at least loss of profits.'" The Court's actual statement was that "[i]n the Corneal case this court held that the so-called `pull and treat' program adopted by the State Plant Board ... could not be carried out on a compulsory basis without compensating the grower for `at least, the loss of profits sustained by the owner whose healthy trees are destroyed... .'" Smith, 110 So.2d at 403. Respondents' reliance on Smith is misplaced. It is clear from Corneal v. State Plant Board, 95 So.2d 1, 7 (Fla. 1957), that the Court's conclusion that the Board had a clear legal duty to compensate grove owners for at least the loss of profits sustained when healthy trees were destroyed was made with regard to determining the compensation required for destruction of the healthy trees.[4] As noted, "the fact remains that some of these healthy trees will be fully productive for at least a year or two and others for several years, depending on their proximity to a tree infested with burrowing nematodes." Id. at 6. The profit that would have been derived from the healthy trees is certainly a reasonable consideration in determining full compensation under the circumstances present in Corneal.
Respondents' reliance on Anhoco Corp. v. Dade County, 144 So.2d 793 (Fla. 1962), is likewise misplaced. Respondents contend that in Anhoco, this Court upheld an outdoor theater owner's claim for compensation for temporary loss of access to its facilities which loss was occasioned as an incident to the taking of the theater's fee interest in a roadbed. In reviewing the district court decision regarding a condemnation action to acquire fee simple title to Anhoco's property and property rights, including the right of access, this Court stated that "in any eminent domain proceeding any damages suffered by the abutting property owner may be adjudicated and awarded." Id. at 797. A careful reading of the decision, together with the Court's prior decision in Florida State Turnpike Authority v. Anhoco Corp., 116 So.2d 8 (Fla. 1959), however, reveals that the Court "expressly granted [the property owner] the opportunity `to present evidence of the value to them of the property and property rights, including the right of access which will be acquired for limited access facilities.'" 144 So.2d at 795 (emphasis added). It was determined that the right of access was not merely regulated, but destroyed, and the "abutting property owners are entitled to compensation for the destruction of their previously existing right of access." Id. at 797.
Even if Anhoco could be read as standing for the broad proposition that all damages may be adjudicated and awarded in a condemnation proceeding, respondents' reliance on the decision is to no avail because the alleged damages flowing from the imposed quarantine were not adjudicated. The trial court granted the nurseries' motion for leave to file a second amended complaint on December 20, 1985. The second amended complaint refers only to the Department's burning of existing nursery stock and alleges only that the destruction of such trees and budwood constituted a taking for which the owners were entitled to full and fair compensation. No allegations regarding the imposed quarantine were made. The trial to determine liability was conducted on September 24, 1986, Judge Oliver L. Green, Jr. presiding. Respondents did file a motion for leave to amend the second amended complaint on October 6, 1986, subsequent to the liability trial, to add a paragraph alleging they were entitled to recover damages for loss of use of business assets, lost profits, etc. No *901 ruling was made on this motion at that point in time. Instead, the trial court's order of liability for taking was issued on October 10, 1986.[5] This order does not expressly find the decontamination process to be a taking, referring instead only to respondents' nursery stock. The "lost production" damages can therefore not be upheld on the basis of the respondents' argument that the quarantine constituted a temporary taking of the nursery properties either.
Because this measure of compensation was not alleged in the complaint upon which the trial court issued its order of taking and because there was no determination in the order of taking rendered subsequent to the trial on liability that the quarantine constituted a temporary taking, this measure of compensation should not have been presented to the jury. It is unnecessary to our decision and we therefore do not decide at this time whether a temporary taking such as alleged is compensable under the Florida Constitution and, if so, whether the quarantine at issue would constitute a compensable temporary taking.
Although we approve that portion of the district court's decision which concludes that the respondents may not recover damages for lost production in this case, we quash the district court's directions that the nursery owners be permitted, upon remand, to amend their complaint in an effort to allege a temporary taking. Such a result is precluded by the rule against splitting causes of action, which flows from the doctrine of res judicata. The rule against splitting causes of action makes it incumbent upon plaintiffs to raise all available claims involving the same circumstances in one action. See Schimmel v. Aetna Casualty & Sur. Co., 506 So.2d 1162 (Fla. 3d DCA 1987); Eagle-Picher Indus., Inc. v. Cox, 481 So.2d 517 (Fla. 3d DCA 1985), review denied, 492 So.2d 1331 (Fla. 1986). The rule against splitting causes of action is predicated on the following basic policy considerations: (1) finality in court cases promotes stability in the law; (2) multiple lawsuits arising out of a single incident are costly to litigants and an inefficient use of judicial resources; and (3) multiple lawsuits cause substantial delay in the final resolution of disputes. See Stanley Builders, Inc. v. Nacron, 238 So.2d 606 (Fla. 1970); Schimmel; Eagle-Picher. As respondents so strongly contend, the prohibition against beginning new citrus production for a period of time was an incident of the Department's destruction of the nursery stock, imposed for purposes of decontamination. The Department's alleged liability for this prohibition, as well as the facts necessary to prove it, existed at the time the first trial relating to liability commenced.
In summary, we approve in part and quash in part the decision of the district court below. We remand to the district court with directions to remand to the trial court for proceedings pursuant to chapter 89-91, Laws of Florida, and this Court's decision in Department of Agriculture & Consumer Services v. Bonanno, 568 So.2d 35 (Fla. 1990).
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT and GRIMES, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion.
KOGAN, Justice, concurring in part, dissenting in part.
I am in basic agreement with the majority opinion. However, I would remand this case to the trial court for a new jury trial to determine the amount of damages because *902 I agree with the reasoning set forth in the opinion of Justice Ehrlich in Department of Agriculture & Consumer Services v. Bonanno, 568 So.2d 35 (Fla. 1990) (Ehrlich, J., concurring in part, dissenting in part).
NOTES
[1] Accordingly, the trial court's instruction that "[i]n determining the value of Plaintiff's immature citrus nursery stock intended to be sold or used for commercial purposes, you may consider the value of such stock assuming it were brought to maturity and then sold" is not entirely accurate. As discussed above, it would be permissible for the trial court to instruct that if, at the growth stage on the date of destruction, there is no market for the particular stage or type of nursery stock due to immaturity, the jury may consider the prospective net revenue which would have been derived from the stock if it had not been destroyed, but sold at the next earliest stage of growth at which it would have been marketable.
[2] The jury was instructed that it need not determine full compensation as of the date of taking if it were determined "that the market for such nursey stock was non-existent." Such instruction should have contained language limiting a determination of nonexistent market due to immaturity. Based upon the evidence and argument presented to the jury, this instruction could have been interpreted to erroneously permit a determination that there was no market on the date of destruction based solely upon the quarantine.
[3] The prequarantine prices may reasonably be considered as a measure of compensation, not as a matter of law as the Department contends, but as a matter of fact. The jury, however, is free to reject it. The Department did not ask for a charge to the jury regarding this measure of compensation and therefore may not claim error for the trial judge's failure to give it.
[4] Compensation was required for those trees which were healthy. As the Court stated, "We have found no case  and none has been cited  holding that a healthy plant or animal, not imminently dangerous, may be destroyed without compensation to the owner in order to protect a neighbor's plant or animal of the same specie. And, indeed, we would not be inclined to follow such a decision, had one been made." Corneal v. State Plant Board, 95 So.2d 1, 6 (Fla. 1957).
[5] A second motion for leave to amend the second amended complaint was filed in October 1987. The decision of this Court with regard to the liability phase of the trial was issued on January 21, 1988. On March 8, 1988, Judge J. Tim Strickland issued a pretrial order pertaining to the trial on damages which granted respondents' pending motions for leave to amend the second amended complaint. We agree with the district court below that because the respondents did not amend their complaint to seek damages for lost production until after the bench trial on liability, the trial court conducting the trial on damages had no occasion to analyze carefully the issue of whether the quarantine constituted a temporary taking.