505 So.2d 592 (1987)
STATE of Florida, DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, Appellant,
v.
MID-FLORIDA GROWERS, INC., and Himrod & Himrod Citrus Nursery, a Partnership Composed of Joe Himrod and Joe B. Himrod, Appellees.
No. 86-2785.
District Court of Appeal of Florida, Second District.
April 10, 1987.
Harry Lewis Michaels, Tallahassee, for appellant.
M. Stephen Turner of Culpepper, Pelham, Turner & Mannheimer, Tallahassee, for appellees.
RYDER, Acting Chief Judge.
We are here concerned with a complicated issue of law which appears to challenge the long-standing precept that the government, through its police power, may destroy or regulate property "to promote the health, morals and safety of the community" without compensating the property owner for the loss of use of the property or for a decrease in property value. The issue on this appeal is whether the state of Florida, pursuant to its police power, has the *593 constitutional authority to destroy healthy, but "suspect" citrus plants without compensating nursery owners. The following facts are undisputed.
During 1984, appellees operated citrus nurseries in Hardee County, Florida. In April 1984, appellees obtained citrus budwood from Ward's Nursery, a citrus nursery in Polk County. On August 27, 1984, a form of citrus canker was discovered at Ward's Nursery. On September 6, 1984, the Department of Agriculture obtained samples from appellees' nurseries. On September 10, 1984, the Department informed appellees that the tests were negative: they did not establish that any stock was infected with citrus canker. Despite this fact, however, on October 2, 1984, appellees were advised that their nurseries had to be burned and that quarantine was not an acceptable alternative. On October 16, 1984, the Department entered an emergency confirmatory order designating appellees' nurseries as eradication areas and directing destruction of their nursery stock from Ward's Nursery and all other stock within 125 feet thereof. From October 7 to October 19, 1984, the Department burned some 137,880 of Mid-Florida's and 143,594 of Himrod's citrus trees.
Appellees brought this action seeking full and just compensation based upon inverse condemnation for the destruction of citrus trees by the state as a result of its efforts to eradicate citrus canker. A trial was held on the liability issue alone. The trial judge held that a taking had occurred and ordered a jury trial as to damages. The trial judge stated:
This cause came on for trial on September 24, 1986, on the issue of liability only, and having weighed the evidence and considered the Pretrial Stipulation, the Court finds:
1. A police power circumstance existed to protect the economic public welfare, and Defendant's actions with respect to Plaintiffs' nursery stock were within its police power.
2. No competent evidence supports the states (sic) concern that the Plaintiffs' nursery stock was infected or diseased so as to justify destruction. The most that can be said for the Defendant is that the Plaintiffs' nursery stock was obtained from a single source where some form of citrus canker was detected. The Plaintiffs' careful methods of operation and the fact that no citrus canker in any form was discovered in the Plaintiffs' nursery stock, leads to the legal conclusion that no citrus canker was present. It is the responsibility of the state to make reasonable efforts to ascertain the presence of infection or disease, under the circumstances of this case. Therefore, a taking has occurred in this instance and Plaintiffs are entitled to full and just compensation. (Emphasis in original).
3. Defendant knew that Plaintiffs were not authorizing full satisfaction of their claims and would accept any payment as partial only, and Defendant forewent any right to rely on its own condition of payment. Therefore, Plaintiffs did not release their constitutional right to just compensation.
This appeal ensued.
Whether regulatory action of a public body amounts to a taking must be determined from the facts of each case. Pinellas County v. Brown, 450 So.2d 240, 242 (Fla. 2d DCA 1984); Pinellas County v. Brown, 420 So.2d 308, 309 (Fla. 2d DCA 1982). The trial court's determination of liability in an inverse condemnation suit is presumed correct and its findings will not be disturbed on appeal if supported by substantial, competent evidence. Faison v. Division of Administration, Department of Transportation, 299 So.2d 629 (Fla. 1st DCA 1974). The trial court's order in the instant case is clearly supported by substantial, competent evidence. Accordingly, we affirm.
Initially, we must draw attention to the difference between the power of eminent domain and the police power. Eminent domain is the sovereign power to take property for a public use or purpose. The sovereign must make just compensation for any property taken. Police power is the sovereign power to destroy or regulate the use of property to "promote the health, *594 morals and safety of the community." The sovereign may exercise its police power without making just compensation for the property taken. Adams v. Housing Authority of City of Daytona Beach, 60 So.2d 663 (Fla. 1952).
A valid exercise of the police power does not preclude an inverse condemnation suit. "It is a settled proposition that a regulation or statute may meet the standards necessary for exercise of the police power but still result in a taking." Albrecht v. State, 444 So.2d 8, 12 (Fla. 1984).
It is difficult to determine when the valid exercise of police power stops and an impermissible encroachment on private property rights begins. No settled formula exists. Whether a valid exercise of the police power results in a taking must be decided on the facts of each case. The Florida Supreme Court has compiled the following list of factors which have been used in analyzing takings in the past:
1. Whether there is a physical invasion of the property.
2. The degree to which there is a diminution in value of the property. Or stated another way, whether the regulation precludes all economically reasonable use of the property.
3. Whether the regulation confers a public benefit or prevents a public harm.
4. Whether the regulation promotes the health, safety, welfare, or morals of the public.
5. Whether the regulation is arbitrarily and capriciously applied.
6. The extent to which the regulation curtails investment-backed expectations.
Graham v. Estuary Properties, Inc., 399 So.2d 1374, 1380-81 (Fla. 1981). The Florida Supreme Court further stated: "If the regulation is arbitrarily and capriciously applied it is an invalid exercise of eminent domain, whereas if a public harm is prevented it is more likely an exercise of the police power." Id. at 1381. The court then stated, "[i]t may be, however, that a regulation complies with standards required for the police power but still results in a taking," citing as authority Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The court construed Pennsylvania Coal Co. as follows:
In Pennsylvania Coal Co. the Court considered a Pennsylvania statute, passed to protect the public safety, which prohibited subsurface mining of coal if such mining would cause subsidence of the surface. The Court held that enforcement of the statute amounted to a taking which required compensation. In holding that the mining prohibition was unconstitutional as applied, the court emphasized that the statute rendered the coal company's rights to subsurface minerals virtually worthless.
Graham, 399 So.2d at 1381.
Similarly, the United States Supreme Court has stated that whether a taking has occurred can only be determined on a case-by-case basis:
While this court has recognized that the "Fifth Amendment's guarantee ... is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569 [4 L.Ed.2d 1554] (1960), this Court, quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. See Goldblatt v. Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987 [990, 8 L.Ed.2d 130] (1962). Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case." United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 1104 [2 L.Ed.2d 1228] (1958); see United States v. Caltex, Inc., 344 U.S. 149, 156, 73 S.Ct. 200, 203 [97 L.Ed. 157] (1952).
Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).
*595 Both the First and Fifth District Courts of Appeal have held constitutional the state's exercise of its police power in ordering the destruction of healthy but suspect trees. Denney v. Conner, 462 So.2d 534 (Fla. 1st DCA 1985); Nordmann v. Florida Department of Agriculture and Consumer Services, 473 So.2d 278 (Fla. 5th DCA 1985). Neither court reached the compensation issue. In Denney, the court stated:
At this time, we do not attempt to determine whether appellants' trees are in fact healthy or diseased. Nor do we address the issue of compensation. We hold only that the immediate final order and the rules under which it was promulgated adequately show that the threat of spreading citrus canker is of sufficient imminence and scope to justify the emergency order entered by the department.
Denney, 462 So.2d at 537. The fifth district in Nordmann followed the first district's Denney decision and rationale.
We join our sister courts in holding that the state's order was a valid exercise of its police power. Unlike our colleagues, however, we must go one step further and determine whether the valid exercise of the police power resulted in a taking. We conclude that it did.
When the state, in the exercise of its police power, destroys diseased cattle, decayed fruit or diseased trees, the constitutional requirement of "just compensation" clearly does not compel the state to reimburse the owner for the property destroyed. Such property is incapable of any lawful use, it is valueless, and it is a source of public danger. "A legislative provision for compensation in such cases is a mere bounty." State Plant Board v. Smith, 110 So.2d 401 (Fla. 1959).
Different is the situation, however, where healthy cattle, fruit or trees are destroyed to protect public health, safety or welfare. While the general principle is that no compensation is required when there is a valid exercise of the police power, the general principle is not without exception. Whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances in that case." Penn; Smith.
Citrus canker is a virulent disease which first appeared in Florida in 1914. At that time, drastic measures were taken to eradicate the state of the disease. The measures included destruction of many citrus trees. Florida was declared free of the disease in 1927.
Citrus canker reappeared in Florida in August of 1984. The Florida Department of Agriculture took immediate steps to eradicate the disease before the infected area spread and resulted in economic disaster for Florida's citrus industry. The Department of Agriculture, acting pursuant to the broad powers given it in Article IV, Section 4 of the Florida Constitution and sections 570.07(21) and 581.031(7), Florida Statutes (1983), began ordering destruction of citrus trees found to be diseased or to be suspect.
Appellees had the misfortune of having innocently bought a few hundred budsticks from Ward's Nursery, which was subsequently declared to be infested with canker. The state examined and tested appellees' trees. The tests proved negative. Yet, the state ordered the destruction of appellees' healthy trees.
We hold that while the state validly exercised its police powers in destroying the citrus trees, a taking occurred when the healthy trees were destroyed. The nursery owners must be compensated. We understand the difficulties the state faces in confronting citrus canker. Canker, unlike spreading decline, is a particularly resilient disease which may be spread by both natural and artificial means and which may lay dormant in healthy plants for some months before manifesting signs of the disease. We understand the difficulties in determining whether canker is present in healthy trees. Destruction of the healthy trees, however, assured the continued vitality of Florida's most valuable citrus industry. Because destruction of the healthy trees benefitted the entire citrus industry and, in turn, Florida's economy, the cost is more *596 properly spread among the many rather than the few who were unfortunate enough to have purchased budsticks from the infected nursery. As the United States Supreme Court stated in Penn Central, citing to Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960), "the Fifth Amendment's guarantee ... is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole". Penn Central, 438 U.S. at 123, 98 S.Ct. at 2659.
While we feel our disposition is correct, because this case involves such an important area of the law and because this malady is likely to revisit us, we certify the following question to the Florida Supreme Court as one of great public importance:
WHETHER THE STATE, PURSUANT TO ITS POLICE POWER, HAS THE CONSTITUTIONAL AUTHORITY TO DESTROY HEALTHY, BUT SUSPECT CITRUS PLANTS WITHOUT COMPENSATION?
Affirmed.
CAMPBELL and LEHAN, JJ., concur.