521 So.2d 101 (1988)
DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, Petitioner,
v.
MID-FLORIDA GROWERS, INC. and Himrod & Himrod Citrus Nursery, Respondents.
No. 70524.
Supreme Court of Florida.
January 21, 1988.
Rehearing Denied April 1, 1988.
Frank A. Graham, Jr., Resident Atty., and Harry Lewis Michaels, Dept. of Agriculture and Consumer Services, Tallahassee, for petitioner.
*102 M. Stephen Turner of Broad and Cassel, Tallahassee, for respondents.
EHRLICH, Justice.
We have for review State of Florida, Department of Agriculture and Consumer Services v. Mid-Florida Growers, Inc. and Himrod & Himrod Citrus Nursery, 505 So.2d 592 (Fla. 2d DCA 1987), in which the district court certified the following question as one of great public importance:
WHETHER THE STATE, PURSUANT TO ITS POLICE POWER, HAS THE CONSTITUTIONAL AUTHORITY TO DESTROY HEALTHY, BUT SUSPECT CITRUS PLANTS WITHOUT COMPENSATION?
Id. at 596. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We answer the certified question in the negative and approve the decision of the district court below.
During 1984, respondents, Mid-Florida Growers, Inc. and Himrod & Himrod Citrus Nursery, operated citrus nurseries in Hardee County, Florida. In April 1984, they purchased citrus budwood from Ward's Nursery in Polk County. Himrod purchased 8,000 budeyes; Mid-Florida received between 8,500 to 9,000. On August 27, 1984, a form of citrus canker was detected at Ward's Nursery. On September 6, 1984, the Florida Department of Agriculture and Consumer Services (Department) obtained samples from respondents' nurseries to determine whether their stock was infected, and informed respondents on September 10, 1984 that the tests did not establish that any of their stock was infected by or infested with citrus canker. Despite the negative test results, the Department advised respondents on October 2, 1984, that their nursery stock must be burned and that quarantine was not an acceptable alternative. From October 7 to October 19, 1984, the Department burned 137,880 of Mid-Florida's and 143,594 of Himrod's trees and budwood. The emergency confirmatory orders designating respondents' nurseries as eradication areas and directing destruction of stock within 125 feet of budwood from Ward's Nursery were not issued until October 16, 1984.
Respondents filed an inverse condemnation suit seeking full and just compensation, contending that the Department's destruction of nursery stock which was not infected or diseased resulted in a taking for public purpose. The Department argued that the destruction occurred pursuant to regulatory and police power and did not constitute a taking. A trial was held on the liability issue alone. Although the trial judge noted that the Department's actions were within its police power, he found:
No competent evidence supports the states (sic) concern that the Plaintiffs' nursery stock was infected or diseased so as to justify destruction. The most that can be said for the Defendant is that the Plaintiffs' nursery stock was obtained from a single source where some form of citrus canker was detected. The Plaintiffs' careful methods of operation, and the fact that no citrus canker in any form was discovered in the Plaintiffs' nursery stock, leads to the legal conclusion that no citrus canker was present. It is the responsibility of the state to make reasonable efforts to ascertain the presence of infection or disease, under the circumstances of this case. Therefore, a taking has occurred in this instance and Plaintiffs are entitled to full and just compensation.
(Emphasis in original).
The district court, on appeal, noted that a valid exercise of the police power does not preclude an inverse condemnation suit and that whether a valid exercise of the police power results in a taking must be decided on the facts of each case. 505 So.2d at 594. The district court also determined that the trial court's order in the instant case was clearly supported by substantial, competent evidence. Accordingly, the district court affirmed the trial court's determination that the nursery owners must be compensated and held that "while the state validly exercised its police powers in destroying the citrus trees, a taking occurred when the healthy trees were destroyed." Id. at 595.
The Department contends that no taking occurred in the instant case because *103 the trees were destroyed in order to prevent a public harm. We, however, agree with the district court's conclusion that destruction of the healthy trees benefited the entire citrus industry and, in turn, Florida's economy, thereby conferring a public benefit rather than preventing a public harm. Id. at 595. Although this factor alone may not be conclusive, we have previously recognized that if a regulation creates a public benefit it is more likely that there is a taking. See Graham v. Estuary Properties, Inc., 399 So.2d 1374, 1381 (Fla.), cert. denied sub nom. Taylor v. Graham, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981). Furthermore, we reject the Department's contention that the state's lack of a possessory or proprietary interest in the destroyed property precludes a finding that a taking occurred. A taking of private property for a public purpose which requires compensation may consist of an entirely negative act, such as destruction. See, e.g., Corneal v. State Plant Board, 95 So.2d 1 (Fla. 1957) (destruction of healthy citrus trees required compensation). As noted by the United States Supreme Court:
In its primary meaning, the term `taken' would seem to signify something more than destruction, for it might well be claimed that one does not take what he destroys. But the construction of the phrase has not been so narrow. The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.
United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 359-60, 89 L.Ed. 311 (1945) (footnote omitted).
The Department next urges that the certified question must be answered in the affirmative because the state, in destroying the trees, validly exercised its police power in conformance with applicable statutes and rules. Although we do not disagree with the Department's contention that the state's order was a valid exercise of its police power, it is a settled proposition that a regulation or statute may meet the standards necessary for exercise of the police power but still result in a taking.[1]See Albrecht v. State, 444 So.2d 8 (Fla. 1984). See also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 425, 102 S.Ct. 3164, 3170, 73 L.Ed.2d 868 (1982). As recently stated by the United States Supreme Court, a basic understanding of "the [Fifth] Amendment makes clear that it is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California, ___ U.S. ___, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987).
This principle is illustrated in State Plant Board v. Smith, 110 So.2d 401 (Fla. 1959), a case involving circumstances similar to the present case.[2] In State Plant *104 Board, a statute provided for destruction of uninfested trees in order to prevent the spread of a citrus disease known as spreading decline. This Court noted that when the state, in the exercise of its police power, destroys decayed fruit, unwholesome meats or diseased cattle, the constitutional requirement of "just compensation" clearly does not compel the state to reimburse the owner for the property destroyed because such property is valueless, incapable of any lawful use, and a source of public danger. The Court went on to conclude that "just compensation" was a clear requisite, however, to the act of destroying healthy trees. Id. at 406-07. See also Corneal, 95 So.2d 1 (A healthy plant may not be destroyed in order to protect a neighbor's plant of the same species without compensation to the owner.) Accordingly, consistent with our decisions in State Plant Board and Corneal, we answer the certified question in the negative.
Finally, we reject the Department's claim that even if the certified question is answered in the negative, no compensation is required under the present circumstances because the trees that were destroyed had been in the presence of or exposed to canker infested nursery stock and were therefore not healthy. As the district court below correctly observed, "[w]hether regulatory action of a public body amounts to a taking must be determined from the facts of each case", 505 So.2d at 593, and the trial judge in an inverse condemnation suit is the trier of all issues, legal and factual, except for the question of what amount constitutes just compensation. See United States v. Certain Parcels of Land in Monroe County, 509 F.2d 801, 803 (5th Cir.1975); Pinellas County v. Brown, 420 So.2d 308 (Fla. 2d DCA 1982), petition for review denied, 430 So.2d 450 (Fla. 1983). The trial court's determination of liability in an inverse condemnation suit is presumed correct and its findings will not be disturbed on appeal if supported by competent, substantial evidence. See Atlantic International Investment Corp. v. State, 478 So.2d 805, 808 (Fla. 1985); Faison v. Division of Administration, Department of Transportation, 299 So.2d 629, 630 (Fla. 1st DCA), cert. denied, 305 So.2d 201 (Fla. 1974); Hardwick v. Metropolitan Dade County, 256 So.2d 387, 390 (Fla. 3d DCA 1972).
A review of the record in the present case reveals substantial competent evidence was presented at trial on which the trial court based its finding that the trees were healthy. The nursery owners testified at trial that the trees from which the budeyes were removed did not have any visible signs of disease and that the Department had certified on the invoices from Ward's nursery that the nursery stock had been visually inspected for plant pests and met at least the minimum requirements of Chapter 581, Florida Statutes. Mr. Himrod testified that the leaves were removed from the twigs at the site where the wood was cut, the wood was trimmed and bundled, packed in ice, and transported to his nursery. Later, the wood was unpacked and placed on benches in the sunlight to dry. When dry, the individual eyes were cut off and grafted onto the liners in the trees in the greenhouse. The sticks were then removed from the nursery and destroyed. He also testified that the tools used in the process were dipped in chlorine to prevent transmitting any virus diseases that may have been present. Mr. Lambert, from Mid-Florida, testified that his nursery followed a process very similar to that described by Mr. Himrod. Dr. Hannon testified as an expert witness for the respondents and stated that the process followed by respondents would diminish the number of living bacterial cells on the wood, if any, and reduce the chances of moving any bacteria with the budsticks. The Department's witness, Calvin Schoulties, conceded that the above steps could reduce the possibility of transmitting any disease that may have been present. Mr. Lambert stated that the budded plants had existed for five months before *105 destruction in optimum conditions for development of bacteria, due to the heat, humidity, and density of the plants in the greenhouses, and that no citrus canker was detected. Dr. Hannon also testified that a nursery environment is more conducive to development of the disease.
The budeyes purchased by Himrod came from Block 7 of Ward's Nursery, a block in which no canker was detected but which lies within 125 feet of an infected block in three different directions. The majority of the budeyes purchased by Mid-Florida also came from Block 7, but some of the budeyes came from Block 106, which tested positive for canker. After the plants were budded, but before receiving notice of a quarantine, approximately 50,000 plants had been transferred out from the respondents' nurseries to customers. Under the Department's emergency rules, 137,800 of Mid-Florida's and 143,594 of Himrod's citrus trees were destroyed after being declared suspect. The 50,000 plants transferred out of the same greenhouses and sold to customers were not destroyed and no canker was ever discovered at these premises. These plants came from areas in the greenhouses which would have caused them to be destroyed if they had still been on the premises at the time the plants in respondents' nurseries were destroyed. We therefore agree with the district court below that the trial court's order in the instant case is clearly supported by substantial, competent evidence.
In conclusion, having answered the certified question in the negative we hold that full and just compensation is required when the state, pursuant to its police power, destroys healthy trees. Because a taking occurred in the instant case when the healthy trees were destroyed, the nursery owners must be compensated. Accordingly, we approve the decision of the district court.
It is so ordered.
SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
McDONALD, C.J., dissents with an opinion.
OVERTON, J., recused.
McDONALD, Chief Justice, dissenting.
To justify a finding of inverse condemnation the majority makes a finding that the actions of the Department of Agriculture, in ordering the destruction of the plaintiffs' plants, conferred a public benefit. I totally disagree that this occurred. The department acted under the provisions of section 581.031(17), Florida Statutes (1985),[*] and its entire course of action was designed to prevent a public harm. The spread of citrus canker is a public harm; the department took steps to prevent the spread and thereby prevent a public harm. In the exercise of its police power, the department can take reasonable steps to avoid the spread of this disease which can, if not properly checked, literally wipe out the citrus industry. The plaintiffs claim that the destruction of its plants was unnecessary to prevent the harm and that as a result there was an unnecessary and unreasonable taking. They cannot show, however, where this action conferred a benefit to the public other than preventing harm; this is inadequate to support a finding of inverse condemnation.
The conduct of the department should be reviewed in the light of the perceived emergency confronting the department when the canker was found. In hindsight, it may be that the department overreacted and confiscated property not needed, but a review of the department's actions should not *106 be made on hindsight. The department had the duty to take emergency measures to prevent an immediate harm  the spread of canker. In viewing its actions from an emergency standpoint, those actions were not unreasonable. The trial judge appeared to base his judgment of inverse condemnation solely on the basis that healthy trees were taken. The issue is not whether the plaintiffs' trees were actually healthy, but rather whether the government, acting responsibly, had reasons to conclude that they might not have been and that it was necessary to destroy them to prevent the spread of a deadly disease. Viewed in this light, the evidence fails to support a claim for inverse condemnation.
The district court of appeal recognized the state's order as a valid exercise of police power, but still approved the finding of inverse condemnation. This could be done only upon a finding that the department's orders and regulations enacted to combat the spread of canker, at the time they were made, were unnecessary or arbitrarily and capriciously applied. See Graham v. Estuary Properties, Inc., 399 So.2d 1374, 1380-81 (Fla.), cert. denied sub nom. Taylor v. Graham, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981). The fact that healthy trees were confiscated does not supply that proof.
Inherent in the decision of Nordmann v. Florida Department of Agriculture & Consumer Services, 473 So.2d 278 (Fla. 5th DCA 1985), which cited Denney v. Conner, 462 So.2d 534 (Fla. 1st DCA 1985), whereby the regulations of the department authorizing the extinction of supposedly healthy plants in a canker emergency were approved, is the finding that no compensation is required. I would so construe and affirm that view. Hence I dissent.
NOTES
[1] We, therefore, also reject the Department's argument that the trial court, in determining the trees were healthy, ignored agency rules which defined the trees as being suspect and subject to destruction and thereby improperly allowed a challenge to the propriety of agency action in an inverse condemnation proceeding. Although the Department correctly contends that the propriety of an agency's action may not be challenged in an inverse condemnation proceeding, section 253.763(2), Florida Statutes (1983), the fact that the action was authorized pursuant to agency rules does not, as noted above, preclude a determination that the action constituted a taking. A review of the record discloses that respondents were not permitted to challenge the propriety of the agency action. The pretrial stipulation provides that the disputed fact to be litigated is "whether under the circumstances present, the burning was a taking of property for which full and just compensation is due," and a trial was held on the liability issue alone.
[2] Petitioner's argument that State Plant Board v. Smith is distinguishable from the present case because the legislature provided that just compensation was a requisite to the action of destruction in the act providing for destruction to eradicate spreading decline is not persuasive. Because article X, § 6, Fla. Const. is self-executing, it is immaterial that there is no statute specifically authorizing recovery for loss. See Jacksonville Expressway Authority v. Henry G. DuPree Co., 108 So.2d 289, 294 (Fla. 1958). See also First English Evangelical Lutheran Church, 107 S.Ct. 2378, 2386 (In the event of a taking the compensation remedy is required by the Constitution. Neither statutory recognition nor a promise to pay is necessary.)
[*] § 581.031(17), Fla. Stat. (1985), grants the Department of Agriculture broad authority:

To supervise, or cause to be supervised, the treatment, cutting, and destruction of plants, plant parts, fruit, soil, containers, equipment, and other articles capable of harboring plant pests or noxious weeds, if they are infested or located within an area which may be suspected of being infested or infected due to its proximity to a known infestation, or if they came from a situation where they were reasonably exposed to infestation, when necessary to prevent or control the dissemination of plant pests or noxious weeds or to eradicate same and to make rules therefor. (Emphasis added.)