558 So.2d 1030 (1990)
J.T. GLISSON, et al., Appellants,
v.
ALACHUA COUNTY, Appellee, and
The National Wildlife Federation, Inc. and The Florida Wildlife Federation, Inc., Intervenors-Appellees, and
The Florida Department of Community Affairs and 1000 Friends of Florida, Inc., Amicus Curiae-Appellees.
No. 88-2111.
District Court of Appeal of Florida, First District.
January 12, 1990.
Rehearing Denied April 18, 1990.
*1032 William O. Miller, G. Stephen Parker, Robert B. Baker, Jr., Southeastern Legal Foundation, Inc., Atlanta, Bruce Brashear, of Watson, Folds, Steadham, Christmann & Brashear, Gainesville, for appellants.
Thomas A. Bustin, County Atty., and Thomas D. MacNamara, Asst. County Atty., Gainesville, Charles L. Siemon, and Andrew C. Stansell, of Siemon, Larsen & Purdy, Chicago, Ill, for appellee Alachua County.
David J. White, Atlanta, for Nat. Wildlife Federation.
Tim Keyser, Interlachen, for Fla. Wildlife Federation.
John O. McKirchy, Gen. Counsel, Fla. Dept. of Community Affairs, Tallahassee, amicus curiae.
Joseph Z. Fleming, of Joseph Z. Fleming, P.A., Miami, for 1000 Friends of Florida, Inc., amicus curiae.
JOANOS, Judge.
This appeal concerns land use regulations adopted by the Alachua County Board of County Commissioners which will impact on appellants' future use of their property. Appellants, owners of real property located in the Cross Creek area of Alachua County, seek review of a final judgment granting Alachua County's motions for involuntary dismissal and partial summary judgment as to various counts of appellants' second amended complaint. Appellants contend that (1) the trial court erred in finding that the challenged amendments and regulations were an exercise of the county's police powers, and in applying the standard of review applicable to police power actions; or alternatively, that if this is an application of the police power, it is one which requires compensation to the landowners; (2) the trial court erred in finding that Counts II through VIII of appellants' second amended complaint were rendered moot due to the subsequent enactment of Comprehensive Plan Amendment 5-87 (CPA-5-87); and (3) the trial court erred in finding that appellants failed to demonstrate that the challenged ordinance caused them to suffer any adverse economic impact. We affirm on all issues.
Pursuant to the provisions of its comprehensive plan, Alachua County designated the Cross Creek region as a special study area. The Cross Creek Special Study Area includes 3,100 acres lying on either side of Cross Creek, between Orange Lake and Lake Lochloosa in southeast Alachua County. The area contains the site of the Marjorie Kinnan Rawlings house (a State of Florida Historic Site). There is little development in the area, and it is surrounded by the Lochloosa Wildlife Management Area and the two lakes. The two lakes and the Cross Creek body of water have been designated as Outstanding Florida Waters. See § 403.061(27)(a), Fla. Stat. (1987).
Appellants are eighteen landowners in the Cross Creek Special Study Area. Their holdings range from less than one acre to 522 acres, held by Mr. Ernest Southward, as trustee for several investors in the property. Appellants Southward and Brown purchased property in the Cross Creek area for development purposes. Other appellants are long-term residents or property owners in or near Cross Creek.
On August 13, 1985, the Alachua County Board of County Commissioners adopted CPA-5-85 as an amendment to the Alachua County Comprehensive Plan. The amendment established specific development guidelines for the Cross Creek area, and was the culmination of the special study of the Cross Creek area. The study contained three general sets of guidelines or policies for the Village Center development area and the Village periphery development area, four resource protection areas, and general development guidelines. The resource protection areas are the wetlands, exceptional upland habitat, hammock zones, and active use zones.
The wetland areas are restricted from all construction activity, except minor accessory uses. Under the regulations, permitted density could be transferred at a rate of one unit per five acres, where there was appropriate contiguous property under the same ownership. Areas designated as exceptional upland habitat are considered conservation *1033 areas, where only one dwelling unit per five acres is permitted. Lot sizes are reduced to one acre and the remaining four acres of the area are to be protected in their natural state. Removal of the existing indigenous vegetation is discouraged, except for bona fide agricultural practices on existing farm lands. The hammock zones are designated as areas which will serve as wildlife habitats of secondary value and generally act as transitional zones to buffer the conservation areas. In the Village periphery, one dwelling unit per five acres is permitted on lot sizes of one acre, clustered so as to preserve the most sensitive or unique areas. The active use zones are designated as areas having comparatively little ecological value, and will be the focus of future development. No active use is permitted within a radius of 750 feet of an eagle nest. Within an additional 750 feet, all residential density has to be transferred to appropriate contiguous property under the same ownership.
CPA-5-85 existed without change or amplification until December 22, 1987, when the Commission adopted Ordinance 87-25. Ordinance 87-25 modified CPA-5-85 by adding provisions for variance applications and created a system for transfer of development rights (TDR's) within the study area to qualifying property within an urban cluster. Under CPA-5-85, if TDR's were issued, they could only be used outside the Cross Creek area, because no urban cluster is located in Cross Creek. With the passage of Ordinance 87-25 two years later, a property owner could transfer density in a restricted use zone to appropriate contiguous property under the same ownership, or to appropriate adjoining property not under the same ownership if all the affected properties were presented for development as a planned unit development (PUD).
Evidence adduced at trial indicated that the areas designated as exceptional upland habitat and hammock are found throughout Alachua County, and are not unique to the Cross Creek area. In addition, there was evidence that many of these areas had been disturbed, either by timbering or by agricultural activities, and that only six of the forty-five active eagles' nests in Alachua County are located in the Cross Creek area. Expert testimony indicated that farming, and cattle grazing are not economically feasible in the Cross Creek area. According to the expert witness, the restrictions imposed under Ordinance 87-25 and CPA-5-85 make it unlikely that a prospective buyer would consider purchasing the property for agricultural purposes. In addition, testimony from a land planner and developer indicated that the value of the individual parcels of property in Cross Creek had been seriously reduced as a result of Ordinance 87-25, and that individual property owners had been denied beneficial uses of their property. The record reflects that appellants Southward, Glisson, and Brown expended varying sums of money prior to passage of CPA-5-85 to prepare their land for residential development. Although Mr. Glisson's plan had received conceptual approval, after passage of CPA-5-85, he was advised by the County Attorney's office that conceptual approval did not entitle a property owner to obtain a permit of any kind. Due to the advice he received from the county attorney, and his personal knowledge of the unsuccessful development approval efforts of Mr. Southward and Mr. Brown, Mr. Glisson considered that any further expenditures for obtaining development permits would be futile.
The county agrees that appellants' property located in the special study area would be more valuable if appellants were free to develop it for use as recreational vehicle and mobile home parks, condominiums, or at suburban intensities. On the other hand, the record reflects that only one appellant has applied for development approval since the adoption of CPA-5-85, and that his application was approved, and the subdivided lots were sold for a substantial sum.
The trial court granted summary judgment with regard to Counts I through VII of the amended complaint, finding these counts moot because they were directed to CPA-5-85, the plan amendment that had been repealed. At the close of appellants' case, the trial court granted Alachua County's *1034 motion for involuntary dismissal as to Counts IX, XI, XII, and XIII, finding that appellants had not demonstrated that the challenged ordinance was arbitrary or capricious, or that it denied the appellant landowners substantial economic use of their land.
The first issue concerns appellants' contention that the land use regulations promulgated by the county constitute an attempt to exercise the power of eminent domain, disguised as an exercise of the police power. In support of this contention, appellants assert that the language of the comprehensive plan amendments and zoning ordinance 87-25, together with trial testimony concerning specific details of the regulations and their impact on appellants' property, demonstrate that the Cross Creek plan constitutes the creation of a "public benefit." Appellants further assert that the evidence demonstrates that the boundaries for application of the Cross Creek plan were drawn on the assumption that the state would buy and preserve the surrounding area, and restrictions were accordingly imposed in the Cross Creek area to conform land uses in the area to those uses in the surrounding areas which are under state ownership. In essence, appellants contend that as owners of property in the Cross Creek area, they are entitled to compensation because the regulations require them to maintain the status quo with regard to present uses of their property, in order to preserve an area as a benefit to be enjoyed by the public at large.
At the outset, it is well settled that the state may, by regulation or condemnation, restrict the use of private property. The fifth amendment was not designed "to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, Cal., 482 U.S. 304, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987). See also Department of Agriculture v. Mid-Florida Growers, Inc., 521 So.2d 101, 103 (Fla.), cert. denied, ___ U.S. ___, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). There is no set formula or test for determining where legitimate government regulation ends and taking begins, in the sense that the regulation has gone too far. MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986); Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978); Goldblatt v. Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962); Graham v. Estuary Properties, Inc., 399 So.2d 1374, 1380 (Fla.), cert. denied, sub. nom., Taylor v. Graham, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981). Not surprisingly, the difficulty has always been in defining "too far," i.e., in distinguishing "the point at which regulation becomes so onerous that it has the same effect as an appropriation of the property through eminent domain or physical possession." MacDonald, Sommer & Frates v. Yolo County, 106 S.Ct. at 2566. "The general rule ... is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).
The propriety of a land use regulation which requires a property owner to maintain the status quo with respect to land use was decided adversely to appellants' position in Graham v. Estuary Properties, Inc. In Graham, the court reaffirmed the rule that the "exercise of the state's police power must relate to health, safety, and welfare of the public and may not be arbitrarily and capriciously applied." 399 So.2d at 1379. See also Sarasota County v. Barg, 302 So.2d 737, 741 (Fla. 1974); Davis v. Sails, 318 So.2d 214, 217 (Fla. 1st DCA 1975); City of Sunrise v. D.C.A. Homes, Inc., 421 So.2d 1084, 1085 (Fla. 4th DCA 1982); Moviematic Industries Corp. v. Board of County Commissioners of Metropolitan Dade County, 349 So.2d 667, 669 (Fla. 3d DCA 1977). The issue in Graham was whether the denial of an application for approval of a development of regional impact (DRI) constituted a taking. The permit was denied primarily to prevent the destruction of a large mangrove forest *1035 as called for by the development plan. The court reviewed the question primarily on the basis of a harm-benefit test involving the following factors:
(1) whether there has been a physical invasion of the property;
(2) the diminution in value of the property, i.e., whether the regulation precludes all economically reasonable use of the property;
(3) whether the regulation confers a public benefit or prevents a public harm;
(4) whether the regulation promotes the health, safety, welfare, or morals of the public;
(5) whether the regulation was applied arbitrarily and capriciously; and
(6) the extent to which the regulation has curtailed investment-backed expectations.
Graham, 399 So.2d at 1380-1381.
In Graham, the court held that the restrictions on development constituted a valid exercise of the police power. The court concluded that denial of a DRI permit prevented a public harm in that the proposed development would pollute the surrounding bays. While recognizing the public would be benefited because the bays would remain clean, the benefit was not deemed compensable because it was "in the form of maintaining the status quo." Graham, 399 So.2d at 1382.
The interests purportedly protected by the regulations at issue in this case are appropriate subjects for exercise of the police power. For example, among the interests deemed legitimate for exercise of the state's police power are such matters as: (1) protection of aesthetic interests, City of Sunrise v. D.C.A. Homes, 421 So.2d at 1085, Moviematic v. County Commissioners, 349 So.2d at 669; (2) preservation of residential or historical character of a neighborhood, Moviematic, 349 So.2d at 669; and (3) protection of environmentally sensitive areas and pollution control, Graham v. Estuary Properties, 399 So.2d at 1381; Moviematic, 349 So.2d at 669. Under certain circumstances, a regulation may meet the standards necessary for exercise of the police power, but still result in a taking which requires compensation. See Department of Agriculture v. Mid-Florida Growers, 521 So.2d at 103; Dade County v. National Bulk Carriers, Inc., 450 So.2d 213, 215 (Fla. 1984); Joint Ventures v. Department of Transportation, 519 So.2d 1069, 1070 (Fla. 1st DCA 1988).
To succeed in a regulatory taking claim, a property owner must demonstrate (1) that a regulation is unreasonable or arbitrary, or (2) that it denies a substantial portion of the beneficial use of the property. Joint Ventures v. Department of Transportation, 519 So.2d at 1070. See also Nollan v. California Coastal Commission, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); First English Evangelical Lutheran Church v. Los Angeles County, 107 S.Ct. at 2386; MacDonald, Sommer & Frates v. Yolo County, 106 S.Ct. at 2566; Herrington v. Sonoma County, 834 F.2d 1488, 1497 (9th Cir.1987), cert. denied, ___ U.S. ___, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989). A police power regulation is not invalid simply because it denies the highest and best use of the property, Penn Central Transportation Co. v. New York City, 438 U.S. 104, 125, 98 S.Ct. 2646, 2659-2660, 57 L.Ed.2d 631 (1978); Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); Graham v. Estuary Properties, 399 So.2d at 1382, or because it dramatically diminishes the value of the property. Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); Graham v. Estuary Properties; 399 So.2d at 1382. Rather, "[i]f the regulation is a valid exercise of the police power, it is not a taking if a reasonable use of the property remains." Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); American Savings & Loan Association v. Marin County, 653 F.2d 364, 368 (9th Cir.1981).
Courts considering the police power/taking dichotomy have held that a taking issue is not ripe for determination until such time as the property owner has received a final determination from the government as to the permissible uses of *1036 the property. Joint Ventures v. Department of Transportation, 519 So.2d at 1073-1074, J. Ervin, specially concurring; Moviematic, 349 So.2d at 671. See also MacDonald, Sommer & Frates v. Yolo County, 106 S.Ct. at 2566. In other words, "an essential prerequisite to a taking claim is a final decision by the government as to what use of the property will be allowed." MacDonald, Sommer & Frates, 106 S.Ct. at 2566; Unity Ventures v. Lake County, 841 F.2d 770, 774 (7th Cir.1988). A final decision may be shown by (1) a rejected development plan, and (2) a denial of a variance. Unity Ventures, 841 F.2d 770, 774 (7th Cir.1988); Kinzli v. City of Santa Cruz, 818 F.2d 1449 (9th Cir.1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988). Although the final decision prerequisite also may be satisfied by proof that attempts to comply would be futile, futility is not established until at least one meaningful application has been filed. Unity Ventures, 841 F.2d at 775; Kinzli, 818 F.2d at 1454.
Where, as in the instant case, a taking claim arises in the context of a facial challenge rather than in the context of a concrete controversy concerning the effect of a regulation on a specific parcel of land, the only issue is whether the mere enactment of the regulation constitutes a taking. Keystone Bituminous Coal Association v. DeBenedictis, 480 U.S. 470, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); Agins v. City of Tiburon, 100 S.Ct. at 2141. The test to be applied in considering a facial challenge is relatively straightforward, i.e., "[a] statute regulating the uses that can be made of property effects a taking if it `denies an owner economically viable use of his land... .'" Keystone Bituminous Coal Association v. DeBenedictis, 107 S.Ct. at 1247, quoting Hodel v. Virginia Surface Mining and Reclamation Assn., Inc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In determining whether a development restriction denies a landowner economically viable use of his property, the focus is on the existence of permissible uses. Hodel v. Virginia Surface Mining and Reclamation Act; Agins v. City of Tiburon; Lake Nacimiento Ranch Co. v. San Luis Obispo County, 830 F.2d 977, 982 (9th Cir.1987). To prevail, the landowner must show that there is no available beneficial use of his property under the land use ordinance. Nacimiento, 830 F.2d at 982. See also Penn Central, 98 S.Ct. at 2662.
If it should be determined that the government's activities effected a taking, subsequent action, such as invalidating the ordinance, will not relieve the government of its duty to provide compensation for the period that the ordinance was in effect. First English Evangelical, 107 S.Ct. at 2389; Joint Ventures, 519 So.2d at 1075. That is, "[t]he determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." Agins, 100 S.Ct. at 2141. See also Keystone, 107 S.Ct. at 1246.
The challenged land use regulations in this case were adopted pursuant to the "Local Government Comprehensive Planning and Land Development Regulation Act." § 163.3161(1), Fla. Stat. (1987). The stated intent of the act is that local government will "encourage the most appropriate use of land, water, and resources, consistent with the public interest; overcome present handicaps; and deal effectively with future problems that may result from the use and development of land within their jurisdictions." § 163.3161(3), Fla. Stat. (1987). Under the provisions of the act, each comprehensive plan must include a future land use plan element, encompassing a conservation plan, and designating "historically significant properties meriting protection." § 163.3177(6)(a), Fla. Stat. (1987).
The record in this case reflects that since adoption of CPA-5-87 and Ordinance 88-11, no individual appellant-landowner has applied for or been denied a development proposal, rezoning request, or variance from the development regulations. Therefore, appellants' challenge to the current land use regulations is a facial challenge. *1037 Application of the test for determining the facial validity of a regulation demonstrates that in this case, the contested regulations substantially advance legitimate state interests, in that the regulations are directed to protection of the environment and preservation of historic areas. Furthermore, because the regulations permit most existing uses of the property, and provide a mechanism whereby individual landowners may obtain a variance or a transfer of development rights, the regulations on their face do not deny individual landowners all economically viable uses of their property.[1] The county concedes that the regulations have diminished the value of appellants' property by restricting some of the more economically rewarding uses to which the property may be put. However, diminution in value of the property is not the test. Rather, it is incumbent upon appellants to demonstrate that they have been denied all or a substantial portion of the beneficial uses of their property, and this they have failed to do.
Furthermore, we note that the "status quo" test set forth in Graham v. Estuary Properties imposes a more stringent test for recovery than the traditional balancing test. See, generally, Keystone Bituminous Coal Association v. DeBenedictis; City of Miami Beach v. Ocean & Inland Co., 147 Fla. 480, 3 So.2d 364 (1941). In Graham, the court determined that reducing the amount of the property to be developed by one-half, did not so diminish the value of the property or the owner's investment-backed expectations as to render the exercise of the police power unreasonable. On the basis of the record before us, even if a proposed development plan had been pursued to a final determination, it is arguable whether under Graham, appellants could show a sufficient diminution in value or loss of investment-backed expectations, to warrant a finding that the contested land use regulations are unreasonable, hence invalid.
The second issue concerns the grant of summary judgment on Counts II through VIII of appellants' amended complaint. Counts II through VI pertain to CPA-5-85, the comprehensive plan amendment adopted by the county and substantially amended in late 1987. In these counts, appellants sought a declaration that CPA-5-85 was invalid, alleging that (1) the amendment was inconsistent with other elements of the county's land use plan, (2) it was an arbitrary and capricious implementation of the county's zoning authority, (3) it violated appellants' right to equal protection, and (4) it resulted in a taking of appellants' property without due process of law and full compensation. Count VII alleged a civil rights violation predicated on the purported unconstitutionality of Counts I through VI. In Count VIII, appellants sought a declaration that CPA-5-87 is invalid because it does not apply on a countywide basis, its concepts are inappropriate in a land use element of a comprehensive plan, and it is inconsistent with portions of the existing land use plan.
The trial court's grant of summary judgment as to these issues was predicated primarily on the determination that the counts of the complaint involving CPA-5-85 were rendered moot by the subsequent enactment of CPA-5-87. In addition, the trial court found no facts supporting appellants' allegations of improper delegation of legislative authority or violation of statutory requirements. Finding no genuine issue as to any material facts with respect to these counts, the trial court ruled that Alachua County was entitled to judgment on these issues as a matter of law.
It is well settled that courts will decline to rule on a moot issue, because such ruling would have no effect on the outcome of the case. Curless v. County of Clay, 395 So.2d 255, 257 (Fla. 1st DCA 1981). If the ultimate relief would be to declare the contested regulation or statute unconstitutional and void, the courts would merely be voiding legislation that had already been voided by repeal. Id., at 258.
*1038 Notwithstanding the general allegations of their complaint, appellants' major premise with respect to the second issue appears to be that the land use regulations, on their face, disclosed that their true purpose was the creation of conservation areas which more appropriately should be established through the conservation easement process. The only relief sought in Counts I through VI was the invalidation of CPA-5-85. It is undisputed that CPA-5-85 was repealed and replaced by CPA-5-87. Therefore, we approve the trial court's determination that any claims predicated on CPA-5-85 were rendered moot. Similarly, we find that the Count VII claim for damages, based on a theory that enactment of CPA-5-85 effected a temporary taking, is without foundation in the record. This claim was presented as a facial challenge, i.e., since no evidence was presented that any development proposal had been processed to completion under CPA-5-85, the only question as to this count is whether the mere enactment of CPA-5-85 denied appellants all economically viable uses of their property. See Keystone Bituminous Coal Association v. DeBenedictis, 107 S.Ct. at 1247; Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). Appellants did not allege that CPA-5-85 deprived them of all beneficial uses of their property during the two-year period that it was in effect, nor does it appear from the record that they could demonstrate that such occurred.
The third issue concerns the involuntary dismissal of Counts IX, XI, XII, and XIII of the second amended complaint. In these counts, appellants alleged that the purpose of CPA-5-87 was to create a public preserve, by requiring individual property owners to maintain the status quo in the area. In Counts IX, XI, and XII, appellants sought invalidation of CPA-5-87, and in Count XIII appellants sought compensation for deprivation of valuable property rights. Thus, all arguments advanced by appellants with regard to this issue relate to the assertion that adoption of CPA-5-87 effected a taking of appellants' property without compensation. Because there has been no application for approval of a development proposal under CPA-5-87, there has been no final decision as to any particular parcel of land, hence a taking has not been shown to exist with respect to any of the affected property.
In summary, we conclude that the challenged amendments and regulations are not facially unconstitutional, and that the amendments and regulations properly address conservation concerns, as mandated by section 163.3177(6)(d), Florida Statutes (1987). Furthermore, the new restrictions on their face do not constitute a taking. However, since the restrictions have not been applied to a specific land use proposal, the taking issue cannot be determined as a factual matter. Accordingly, the amended final judgment is affirmed in all respects.
ERVIN and BARFIELD, JJ., concur.
NOTES
[1] Prior to adoption of CPA-5-85, superseded by CPA-5-87, residential development was permitted at the rate of one unit per acre. Under CPA-5-87, residential density has been reduced to one unit per five acres.