567 So.2d 515 (1990)
Doyle CONNER, As Commissioner of Agriculture, State of Florida, Department of Agriculture and Consumer Services of the State of Florida, and the State of Florida, Appellants,
v.
REED BROS., INC., Appellee.
No. 89-03291.
District Court of Appeal of Florida, Second District.
September 21, 1990.
Mallory E. Horne, General Counsel, Florida Dept. of Agr. and Consumer Services, Tallahassee, for appellants.
Douglas A. Lockwood, III, and Kerry M. Wilson of Peterson, Myers, Craig, Crews, *516 Brandon & Mann, P.A., Winter Haven, for appellee.
ALTENBERND, Judge.
The Department of Agriculture appeals an order of taking in an inverse condemnation action arising from the citrus canker eradication program. We affirm the trial court because it correctly followed the guidelines established in Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla.), cert. denied sub nom., Taylor v. Graham, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981), and Department of Agriculture v. Mid-Florida Growers, Inc., 521 So.2d 101 (Fla. 1988). Because the parties agree that the facts in this case are unique and concern a quarantine to prevent only economic damage, we doubt this citrus canker case announces any rules of broad application concerning other types of quarantines. Accordingly, we decline to certify this case as one involving issues of great importance.[1]
Reed Brothers, Inc., owns a citrus nursery in Polk County, Florida. In 1985, Reed Brothers specialized in growing citrus seedlings from the seed of the Swingle hybrid, which is a member of the citrumelo group. Reed Brothers grew these seedlings as root stock in its greenhouses. It sold its seedlings to other nurseries. Those nurseries grafted suitable bud stock to the seedlings and raised the grafted citrus plants until they were sufficiently mature to plant in groves.[2]
In September 1985, the Department imposed a broad quarantine on the movement of any variety of citrus nursery plants. By November 1985, the quarantine was narrowed, but still restricted citrus of the Swingle hybrid. Effective December 16, 1985, the Department adopted an emergency rule which stated that citrus of the Swingle hybrid, including seedlings and seed source trees, would be under quarantine until November 1, 1986.
At the time of the quarantine, Reed Brothers had approximately 365,000 Swingle hybrid seedlings and a small grove of Swingle seed source trees. The seedlings were ready to market. Typically, Reed Brothers' seedlings were sold after three-to-six months of growth, which is the ideal time for grafting. It is undisputed that these seedlings had no commercial value except as root stock and that a seedling which was one year old would no longer be suitable for grafting.
In December 1985, the Department presented Reed Brothers with a proposed compliance agreement requiring either a one-year quarantine of its nursery or the destruction of all its seedlings. Either option proposed by the Department had the effect of totally destroying the seedlings' market value. Moreover, the Department would not allow Reed Brothers to begin a new crop with a different variety of seeds unless it also destroyed the Swingle seed source trees in the grove.
Although Reed Brothers did not challenge the December 16, 1985, quarantine order in either an administrative or judicial proceeding, it did attempt to find someone in the Department who would allow Reed Brothers to save its trees and seedlings. Its efforts were unsuccessful. Reed Brothers declined to sign the proposed compliance agreement but did destroy its seedlings and seed source trees under departmental supervision as required by the agreement. Thereafter, Reed Brothers brought this action for inverse condemnation.
It is undisputed that no one ever observed any sign of disease in any of Reed Brothers' trees or seedlings, and the stock appeared healthy. In 1985, however, the Department's experts believed that the state was experiencing an outbreak of citrus canker, that the disease could remain dormant or undetectable for a significant period of time, and that Swingle variety citrus provided an ideal host for the disease. *517 Thus, the quarantine of Reed Brothers was purely precautionary to prevent a potential, but invisible and undiagnosed, disease from spreading to other groves. Since 1985, expert opinion on this subject has changed dramatically. Nevertheless, we emphasize that neither the trial court nor this court has determined that the Department's earlier opinions were arbitrary, capricious, or unreasonable.
After hearing the evidence, the trial court determined that the Department had properly exercised its police powers by imposing the quarantine. Nevertheless, it found that the Department had deprived Reed Brothers of all or most of its interest in the property. Relying upon Estuary Properties and Mid-Florida Growers, the trial court found a taking under article X, section 6, Florida Constitution.
The Department forcefully argues that a quarantine as applied to a specific property cannot be both a lawful exercise of police power and a constitutional taking. It argues that the Florida Supreme Court misapplied Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922),[3] in Mid-Florida Growers. Even if the Department is correct in its argument, this court has no authority to overrule Mid-Florida Growers and Estuary Properties.
In Estuary Properties, the court held that:
There is no settled formula for determining when the valid exercise of police power stops and an impermissible encroachment on private property rights begins. Whether a regulation is a valid exercise of the police power or a taking depends on the circumstances of each case. Some of the factors which have been considered are:
1. Whether there is a physical invasion of the property.
2. The degree to which there is a diminution in value of the property. Or stated another way, whether the regulation precludes all economically reasonable use of the property.
3. Whether the regulation confers a public benefit or prevents a public harm.
4. Whether the regulation promotes the health, safety, welfare, or morals of the public.
5. Whether the regulation is arbitrarily and capriciously applied.
6. The extent to which the regulation curtails investment-backed expectations.

See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); Newman v. Carson, 280 So.2d 426 (Fla. 1973); State Plant Board v. Smith, 110 So.2d 401 (Fla. 1959); Varholy v. Sweat, 153 Fla. 571, 15 So.2d 267 (1943).
Estuary Properties, 399 So.2d at 1380-81. Although the abovequoted language in Estuary Properties seems to contemplate a dichotomy separating the valid exercise of police powers from takings, the supreme court has unequivocally held that "it is a settled proposition that a regulation or statute may meet the standards necessary for exercise of the police power but still result in a taking." Mid-Florida Growers, 521 So.2d at 103. See also Albrecht v. State, 444 So.2d 8 (Fla. 1984).
In this case, the trial court did not make express findings on the Estuary Properties factors. It is reasonably clear, however, that the evidence would support the following evaluation of these factors:
1. The quarantine, by necessitating a supervised physical destruction of the citrus on this property, involved a police power that included a limited physical invasion of the property.
2. The diminution in value of the affected property was virtually total.[4] The *518 police power precluded all economically reasonable use of the property.
3. The regulation conferred a public benefit by protecting an important industry from economic damage, rather than prevented a public harm such as protecting the public from a manifest disease.
4. The quarantine promoted the welfare of the state, but was only marginally important to the public's health, safety, and morals.
5. The regulation was not arbitrarily or capriciously applied to this Swingle nursery.
6. Reed Brothers had significant, reasonable investment-backed expectations which were completely curtailed by the quarantine.
The Department maintains that Reed Brothers cannot establish a constitutional taking unless it proves that the regulation failed to promote any valid interest of health, safety, welfare, or morals of the public (factor 4), or that the regulation was arbitrary as applied to this property (factor 5). In other words, the Department argues that a ruling in its favor on either of these two factors is dispositive of the issue of taking and eliminates the need to consider and balance each of the remaining enumerated factors. We find nothing in Estuary Properties or Mid-Florida Growers which would permit us to adopt this argument.
We hold that the trial court properly found a taking in this case based upon a balancing of the relevant factors. Even though the fifth factor  the regulation was not arbitrarily or capriciously applied  supports the Department's position, and the fourth factor  the quarantine promoted only the state's welfare and was of marginal importance to health, safety, and morals  does not strongly support either side, the balance of the other factors permitted the trial court to conclude that a taking had occurred.
The Department's confusion concerning the concept of police power is understandable.[5] Courts and commentators have applied a "police power" analysis for at least two interrelated, but distinctly different, purposes.[6] When one examines a potentially invalid regulation which may constitute a taking, these two purposes are easily confused.
First, the concept of police power is used in the context of substantive due process. Generally, in this context, a police power is a valid governmental power that promotes the public health, safety, welfare or morals. J. Nowak, R. Rotunda, and J. Young, Constitutional Law, 480 (2d ed. 1983). Under the due process clause of the fifth and fourteenth amendments and under the state counterpart, article I, section 9, Florida Constitution, a regulation may be invalid and unenforceable if it is arbitrary and capricious. See Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Estuary Properties; 1 P. Nichols, The Law of Eminent Domain § 1.42 (3d ed. 1989).
Second, the concept of police power is used more narrowly to describe a government action which regulates property without constituting a taking. J. Nowak, R. Rotunda, and J. Young, Constitutional Law, 480 (2d ed. 1983). Nichols, for example, states: "Nevertheless, where the exercise of the police power is properly applicable, the constitutional provision that property shall not be taken without due process of law is inapplicable." The Law of Eminent Domain at § 1.42[1]. In this context, the concept of police power is used to define the boundaries of a taking under the just compensation clause of the fifth amendment and its eminent domain counterpart in article X, section 6, of the Florida Constitution.
*519 Although the due process clause and the just compensation clause are both contained within the fifth amendment of the United States Constitution, it seems clear that the concept of police power now requires separate analysis for each clause.[7] In this case, as in Mid-Florida Growers, the Department's regulation is a valid police power for purposes of substantive due process. In each case, however, as applied to the specific groves, the regulation constituted a taking for purposes of the just compensation clause and the state's eminent domain clause. In Nichols' terminology, the application of the regulation to these groves was not a valid police power under the just compensation and eminent domain clauses.
The Department argues that the rule announced in this case could have a chilling effect on the exercise of its duty to protect the public from agricultural risks which can be controlled only through quarantines. It suggests that the health and safety of Floridians would be imperiled if it were required to delay or forego a quarantine due to an evaluation of a quarantine's potential cost to taxpayers versus the benefit it would provide. While these concerns merit debate, we do not believe they are justified by the holding or by the unique circumstances in this case. The balance of factors in this case by the trial court and our analysis on appeal is strongly affected by the absence of any risk to public health or safety. The balance would surely have weighed far greater in favor of the Department if this quarantine had been necessary to prevent a public harm or if it had protected a health or safety interest. See Conner v. Carlton, 223 So.2d 324 (Fla.), appeal dismissed, 396 U.S. 272, 90 S.Ct. 481, 24 L.Ed.2d 417 (1969).
Affirmed.
SCHEB, A.C.J., and CAMPBELL, J., concur.
NOTES
[1] Since we are expressly interpreting a provision of the Florida Constitution, the Florida Supreme Court will have an avenue of jurisdiction. Fla.R.App.P. 9.030(a)(2)(A)(ii).
[2] Thus, this nursery's business was much more limited than the business described in Department of Agriculture v. Mid-Florida Growers, Inc., 521 So.2d 101 (Fla. 1988).
[3] A thorough discussion of the "Holmesian doctrine" enunciated in this case can be found in Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964).
[4] This is clearly true for the seedlings since they are personal property. If the seed source trees are viewed as merely a portion of the relevant real property, it is less true for them. The Department does not argue that the trees should be treated separately from the seedlings.
[5] The difficulties involved in differentiating a "police power" and a "taking" under both substantive due process and just compensation are well demonstrated in San Diego Gas & Electric Co. v. City of San Diego, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting).
[6] See Costonis, Presumptive and Per Se Takings: A Decisional Model for the Taking Issue, 58 N.Y.U.L.Rev. 465 (1983).
[7] Though beyond the essential scope of this opinion, it is interesting to consider the extent to which the concept of police power for purposes of just compensation seems to have narrowed while its substantive due process counterpart has expanded. Opinions such as Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), and Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), were announced during the reign of Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). Under Lochner, the judiciary limited the legislature's power to enact many statutes which regulated property. Since Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), the courts have allowed the legislature to vastly increase the sphere of regulations affecting property. When there were fewer, less-restrictive statutes regulating property as a result of substantive due process, there was a reduced need to compensate persons under eminent domain for property affected by regulation. Once the courts opened the doors to statutory and regulatory limitations on private property, the need to compensate persons for socially reasonable restrictions which substantially impacted private rights increased. See generally, Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Thus, the concept of police power in these two constitutional spheres seems to have shifted as the courts have changed emphasis in the effort to create Holmes' "civilized" government which does not sacrifice "the citizen more than it can help." O.W. Holmes, The Common Law 37 (M. Howe ed. 1963).